483 F.2d 102
 83 L.R.R.M. (BNA) 2859, 84 L.R.R.M. (BNA) 2976,
71 Lab.Cas. P 13,818, 73 Lab.Cas. P 14,260
 W. C. SANDERSON Plaintiff-Appellee,
v.
FORD MOTOR COMPANY, Defendant-Appellant.
W. C. SANDERSON, Plaintiff-Appellee.
v.
UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, UAW, LOCAL UNION NO. 255,
Defendant-Appellant.
 No. 72-2109.
 United States Court of Appeals,
Fifth Circuit.
 July 12, 1973.
Rehearing and Rehearing En Banc Denied Nov. 21, 1973.
 
 Almon & McAlister, Vincent McAlister, Sheffield, Ala., for Ford.
 William E. Mitch, Birmingham, Ala., for United Auto.
 Robert L. Potts, Frank V. Potts, Florence, Ala., for Sanderson.
 Before BELL and THORNBERRY, Circuit Judges, and GROOMS, District Judge.
 THORNBERRY, Circuit Judge:
 
 
 1
 This labor relations case arises out of a seniority dispute between Sanderson and Morrow, two employees of Ford Motor Company at its Sheffield, Alabama plant. The dispute was initially resolved adversely to Sanderson, and he sued (1) Ford under the Labor Management Relations Act Sec. 301, 29 U.S.C.A. Sec. 185, for breach of the collective bargaining agreement between Ford and his Union[1] and, in a separate action, (2) the Union for breach of its duty to represent plaintiff fairly and for wrongfully inducing Ford to breach the collective bargaining agreement. The two cases were consolidated for trial, and judgment for plaintiff was entered upon jury verdicts in both cases. Damages were assessed equally against each defendant, and reinstatement was ordered. Ford and the Union appeal, arguing that the district court improperly instructed the jury on the Union's duty of fair representation toward the plaintiff and the Union's power to settle an individual employee's grievance. We reverse and remand.
 
 I. Facts and Proceedings Below
 
 2
 The main business of the Ford Motor Company plant near Sheffield, Alabama, where this case arose, is to convert molten aluminum into component parts for use in Ford automobile engines and transmissions. The plant employs about 980 hourly employees, for whom the Local Union No. 255 is the exclusive collective bargaining representative.
 
 
 3
 Under the collective bargaining agreements[2] concluded between Ford and the Union in 1967 and in effect at all times relevant to this case the hourly employees are grouped into two basic units, the skilled trades group and the unskilled trades group. The agreements provide that seniority "shall be by interchangeable occupational groups" and that an employee's seniority in the skilled group "shall be computed from his date of entry on that classification." In other words, in a skilled classification, seniority is figured from the employee's first day on the job, and seniority he may have previously acquired in an unskilled classification does not transfer or otherwise increase his skilled seniority.
 
 
 4
 An employee acquires seniority after a total of three months' work in a trades group within a year of the date he was hired. Until he has attained seniority he is classed as a "probationary employee". Under the collective agreements, Ford retains "sole discretion as to the laying off, transferring and rehiring of probationary employees except in cases of claimed discrimination." When a probationary employee is laid off, unless Ford then anticipates that the layoff will be temporary, or he is recalled within a time period shorter than the time he worked, his employment is terminated and he is not credited with any accumulated time toward seniority.
 
 
 5
 Ford maintains a written "promotion from within" policy, under which it gives current employees consideration for job openings within the plant before nonemployees.[3] The record shows that Ford and the Union accept this policy as a satisfactory and desirable principle which Ford in fact follows and is entitled to follow in its hiring practices. Although the policy is not formally incorporated into the collective bargaining agreement, recognition of its legitimacy is implicit in the collective contract section governing promotions, which provides that when merit and ability are equal the employee with the greatest seniority shall receive preference.[4]
 
 
 6
 The adversaries in the seniority dispute which has given rise to this case are Willie Sanderson and Charles Morrow, two employees at Ford's Sheffield plant. Morrow was last rehired on November 18, 1967 as a permanent mold operator, a position classified in the unskilled trades group, and he attained seniority in that position after three months' work. In April 1969 an opening occurred for a painter-glazier, a skilled position, and Morrow bid for the job. Instead of promoting Morrow "from within" to fill the vacancy, on April 21, 1969 Ford hired Sanderson for the job, who had done temporary work for Ford before but was not a Ford employee at that time. Morrow, with the support of the Union, protested initially but abandoned his protest when Ford assured him and the Union that Sanderson's job was a temporary one-that is, one that would last less than three months and therefore would not lead to the acquisition of seniority-and that Morrow's bid would be recognized when a permanent job became available. When it subsequently became apparent that due to the illness of another painter-glazier Sanderson's job would last longer than the three months, Morrow and the Union again protested to Ford that Morrow had a superior right to the permanent painter-glazier job based on the promotion-from-within policy and Ford's specific commitment to give Morrow the next permanent painter-glazier job. Ford tentatively agreed, and laid Sanderson off on July 17, 1969, four days before the end of his third month on the job, so that he would not attain seniority before the dispute could be resolved. After protests from Sanderson, negotiations between Ford and the Union produced a "settlement."[5] In accordance with its terms, on August 4, 1969, Sanderson was reinstated,[6] and Morrow was transferred from his position as a mold operator to a position as painter-glazier. Ford personnel records continued to reflect April 21, 1969 as Sanderson's skilled-trades date-of-entry. Although Morrow did not begin on the job until August 4, 1969, Ford and the Union agreed to treat him as a seniority painter-glazier and to assign him an artificial skilled-trades date-of-entry of April 18, 1969, three days earlier than Sanderson's date-of-entry. Thus, under the settlement, Morrow was considered the senior painter-glazier, although he had begun work on the job over three months after Sanderson.
 
 
 7
 On August 6, 1969 Ford and the Union officials met with Sanderson and requested him to express his consent to the settlement of the dispute by signing a written letter agreement, but Sanderson refused stating he would not "sign away his seniority."[7]
 
 
 8
 Two days later, however, on August 8, Sanderson did sign the agreement, or one similar to it, after receiving assurance from Ford and the Union representatives that he would not thereby sign away his seniority. Precisely what Sanderson signed was disputed at trial. The body of the letter agreement, as it was introduced into evidence below, read:
 
 
 9
 In an effort to resolve the dispute existing between the parties relating to the respective skilled-trades date-of-entry seniority of Messrs. Charles E. Morrow, SS No. uon-ke-hultand Willie C. Sanderson, SS No. hvi-ua-fzbw into the classification of Painter-Glazier at the Sheffield Plant, the following is resolved and will be so recorded on Company records:
 
 
 10
 Employee SS No. Company Plant Skilled Trades
 Service Seniority (Painter-Glazier)
 Date Date Date-of-Entry
---------------- ---------- ------------- ------------ --------------------
 Morrow, Charles 418-40-73- 12/18/67 12/18/67 4/18/69
 E. 70
 Sanderson, 419-09-98- 4/21/69 4/21/69 4/21/69
 Willie C. 51
 
 
 11
 It is further agreed to and understood, as attested by all parties involved and undersigned, that this settlement is made without any involvement of any wage adjustment to either of the above-named principals, and without establishment of precedent in any future or past instances.
 
 
 12
 Sanderson testified that the material relating to Morrow's date of entry did not appear on the letter when he signed it, thus necessarily implying that it was added later. Further, he testified to his understanding, drawn from assurances of a Ford Labor Relations Supervisor and a Union representative, that his signature would only confirm his own date-of-entry and would not waive any seniority rights. The Ford officials and the Union representatives involved, on the other hand, denied making any misrepresentations as to the contents or effect of the agreement and testified that the agreement had not been changed or modified after Sanderson signed it. The jury resolved the fact dispute in Sanderson's favor, finding that Sanderson did not voluntarily sign the letter agreement dated August 6, 1969, and that the Union had wrongfully induced him to sign it.[8]
 
 
 13
 In the weeks that followed the signing of the August 6 letter agreement, plant rumors reached Sanderson that Ford and Union officials were claiming he had indeed signed away his seniority, and he attempted to file a grievance with the various Union officials to remove any doubt concerning his seniority rights. The Union refused to process the grievance, however, taking the position that Sanderson either had no grounds for grievance as long as he was working or had waived them by signing the August 6 letter, Notwithstanding the continuing disagreement, Sanderson and Morrow both worked satisfactorily as painter-glaziers until the most senior painter-glazier, Cole, recovered from his illness and returned to work. Cole's return necessitated the lay-off of the least senior painter-glazier, and since Ford's records showed Sanderson to be least senior, he was laid off on October 20, 1969.[9] Sanderson attempted to grieve his lay-off, again asserting that he was senior to Morrow, and the Union again refused to take up and process the grievance, citing the August 6 letter agreement as the conclusion of the matter.
 
 
 14
 On October 13, 1970, Sanderson filed suit in the Circuit Court of Colbert County, Alabama, against the Union for breach of its duty of fair representation and wrongfully inducing Ford to breach the collective bargaining agreement, and on November 24, 1970, he filed a second suit in the Federal District Court for the Northern District of Alabama against Ford for breach of the collective bargaining agreement. The Union removed the first suit to the federal district court where the second one was pending, and the two were consolidated for trial. The district court submitted the cases to the jury on special interrogatories, each of which the jury answered favorably to the plaintiff, as follows:
 
 
 15
 I. Did plaintiff, W. C. Sanderson, voluntarily sign on August 8, 1969, the letter agreement dated August 6, 1969? No.
 
 
 16
 II. Did defendant, union, breach its duty of fair representation through manipulating Morrow's seniority by inducing Sanderson to sign the letter agreement dated August 6, 1969? Yes.
 
 
 17
 III. Did defendant, union, wrongfully induce defendant Ford to breach its collective bargaining agreement by laying plaintiff off and retaining Morrow when in fact plaintiff's seniority was superior? Yes.
 
 
 18
 IV. Did defendant union breach its duty of fair representation in refusing to process plaintiff's grievance? Yes.
 
 
 19
 V. Did defendant Ford breach its collective bargaining agreement by laying off plaintiff and retaining Morrow when plaintiff actually had superior occupational group seniority? Yes.
 
 
 20
 VI. We find that plaintiff has sustained actual damages to date in the amount of $20,636.69.
 
 
 21
 VII. We find that plaintiff will sustain reasonably ascertainable damages in the future in the amount of $100,000.00.
 
 
 22
 The court found the Union and Ford equally at fault and apportioned damages, in the amounts found by the jury, equally between them. Further, the court ordered Ford to reinstate plaintiff in his painter-glazier job with a skilled trades date-of-entry prior to that of Morrow, and enjoined Ford and the Union from discriminating against Sanderson in respect to seniority or other conditions of employment. The award of future damages against each defendant was suspended on the condition that Ford reinstate Sanderson as required in the court's order.
 
 II. The Issues
 
 23
 Authoritative precedents have made clear the legal contours of the actions Sanderson has brought against his union and his employer. The National Labor Relations Act Sec. 9(a), 29 U.S.C.A. Sec. 159(a), confers on a duly elected union authority to act as exclusive collective bargaining representative for an appropriate bargaining unit, and N.L.R.A. Sec. 8(b), 29 U.S.C.A. Sec. 158(b), imposes on the union the corresponding duty to represent fairly the interest of each employee in the unit in dealings with the employer. The federal courts have jurisdiction to adjudicate a suit by an individual employee against the union for breach of this duty.[10] Vaca v. Sipes, 1967, 386 U.S. 171, 176-189, 87 S.Ct. 903, 909-916, 17 L.Ed.2d 842. Under the fair representation doctrine, "the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and avoid arbitrary conduct." Id., 386 U.S. at 177, 87 S.Ct. at 910. Thus, the duty is defined by three distinct standards of conduct; a violation occurs "only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." Id., 386 U.S. at 190, 87 S.Ct. at 916; see also Griffin v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, 4th Cir. 1972, 469 F.2d 181.
 
 
 24
 An employee's action directly against his employer for breach of the collective bargaining agreement concluded between the employer and the union lies under the Labor Management Relations Act Sec. 301, 29 U.S.C.A. Sec. 185. Smith v. Evening News Association, 1962, 371 U.S. 195, 83 S.Ct. 267, 9 L. Ed.2d 246. The employer may defend such a suit on the grounds that the employee has failed to exhaust the remedies available to him under the collective agreement, but this defense is not available if, as is true in this case, only the union has power to press the grievance beyond the initial stages of the contractual grievance procedure and if the union's wrongful refusal to process his grievance prevents him from exhausting his contractual remedies. Vaca v. Sipes, supra, 386 U.S. at 185, 87 S.Ct. at 914. Thus, a union's breach of its duty of fair representation may open the way not only to a suit against itself, but also against the employer. When both the employer and the union are sued, as in this case, the issue of the union's breach of its duty of fair representation may be equally important for both defendants.
 
 
 25
 The main thrust of the instant appeal by Ford and the Union concerns the district court's instructions to the jury pertaining to this crucial fair-representation issue. They object particularly, as they did in the district court, to the charge given with respect to the first interrogatory that "as a matter of law Ford and the Union could not have altered Mr. Morrow's seniority date in violation of the terms of the contract without the concurrence of Mr. Morrow and Mr. Sanderson." This instruction, considered in context,[11] took from the jury the issue of whether, apart from Sanderson's consent, the Union acted arbitrarily, discriminatorily, or in bad faith and left to the jury the question of Sanderson's consent as the single and pivotal fact issue in the case. It was predicated on the legal conclusion, which it communicated to the jury, that adjusting Morrow's date-of-entry was a violation of the contract and could not be squared with any reasonable interpretation of it.
 
 
 26
 Appellants urge that the instruction was improper for two reasons. They argue first that their action in settling the seniority dispute between Sanderson and Morrow was based on interpretation of the contract rather than violation of it. Secondly, appellants argue that in any event the consent issue was irrelevant, since the Union's power to function as bargaining representative is not dependent on the consent of the concerned employee each time a grievance is filed, and that the district court improperly instructed a verdict, in effect, on the single relevant issue in the case- whether the Union acted arbitrarily, discriminatorily, or in bad faith.
 
 
 27
 In appellee's view, on the other hand, the action of the Union clearly contravened the collective contract terms and cannot be justified as an interpretation of the contract or a valid exercise of discretion. He argues that regardless of whether the Union acted in good faith, its advocacy and acceptance of a settlement which directly contravened the clear and unambiguous terms of the collective bargaining agreement-specifically, those which fixed an employee's first day on the job as his skilled-trades date-of-entry-was arbitrary as a matter of law if the employee did not agree to waive his rights under the collective bargaining agreement and that the consent issue was therefore properly the only one left to the jury.
 
 
 28
 Thus, issue is joined first on the question whether the union acted in clear contravention of the terms of the contract. If it did, the further question is presented whether, as a matter of law, a union violates its duty of fair representation to an employee when it agrees to a settlement of his grievance which clearly contravenes unambiguous terms of the collective agreement. The Union has also raised the issue whether the applicable Alabama statute of limitations barred the action against the Union.
 
 III. Fair Representation
 
 29
 Appellee's argument that Union imposed on him a settlement which violated his rights under the collective contract is simple and straightforward: The contract plainly provides that an employee's seniority in the skilled-trades group shall be computed from his first day on the job. The written provision is clear and unambiguous and allows no exceptions. Morrow's date-of-entry was "adjusted" to a date over three months before his first day on the job as a painter-glazier so that Sanderson's seniority rights were subordinated to Morrow's The adjustment obviously violated the contract.
 
 
 30
 This argument fails, however, to take into account that collective bargaining agreements often include terms besides those which appear in the written contract. This court has previously recognized that "an oral agreement between the parties to a collective bargaining contract may modify, supplement or amend the collective bargaining contract." Watson v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, 5th Cir. 1968, 399 F.2d 875, 879. Necessarily, a written policy which both sides accept, such as the promotion-from-within policy in this case, is also capable of becoming part of the agreement. Further, the conduct of the parties, and the premises on which they act in their dealings with each other are highly relevant in ascertaining the actual "terms" of the collective agreement. "[T]he industrial common law-the practices of the industry and of the shop-is equally a part of the collective bargaining agreement although not expressed in it." United Steel Workers of America v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 581, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409. In this case, the record shows conclusively that Ford's promotion-from-within policy is a part of the industrial common law which obtains at its Sheffield plant, and as such it must be considered a part of the collective contract. It was undisputed at trial that Ford and the Union accepted the policy as a principle which in fact governed hiring at the plant. Recognition of the policy is further implicit in provisions of the written agreement.[12]
 
 
 31
 When the promotion-from-within policy is seen as part of the collective agreement, a conflict between the policy and the date-of-entry provision becomes apparent, which we think properly called for interpretation by Ford and the Union. Nor can we say that the result they reached was a clear contravention of the contract or clearly beyond the bounds of reasonable interpretation.
 
 
 32
 It must be recognized that collective bargaining agreements cannot and do not precisely anticipate all problems which arise in the employment context to which they apply.
 
 
 33
 Many provisions do little but establish the framework for further bargaining. Others have a generality which obviously looks to joint labor-management particularization. Deliberate ambiguities, inadvertent omissions, and unforeseen contingencies require continual rule making which, passing in the guise of interpretation, parallels the law making of courts and administrative agencies.
 
 
 34
 Cox, Rights Under A Labor Agreement, 69 Harv.L.Rev. 601 (1956). In Watson v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, 5th Cir. 1968, 399 F.2d 875, another case in which the interpretation-versus-violation issue was presented, this court noted the impossibility of foreseeing all the problems which will develop under a collective agreement and observed, "The interpretative procedure is necessitated by the very nature of collective bargaining agreements that involve the triangle of often diverging interests of employers, unions, and employees covering a wide range of conduct and an enormous variety of problems." Id. at 879.
 
 
 35
 The problem in this case does not arise from the failure of the contract to treat a problem area or an ambiguity in a single provision, but from the conflicting results which different contract terms indicate when applied to a single set of facts. The date-of-entry term, taken alone, prescribed that Morrow's date-of-entry should be his first day on the job, a date over three months after Sanderson's date of entry. Under the promotion-from-within policy and Ford's commitment to the Union and Morrow based on it, however, Morrow had a superior claim to the painter-glazier opening.[13] But for the impossibility of predicting that the opening would become a permanent job, Morrow should have received the job initially, with the early date-of-entry. To give effect to Morrow's prior claim, Ford could have laid off Sanderson and replaced him with Morrow at any time before Sanderson attained seniority. This course would, to be sure, have avoided any conflict between contract provisions. Sanderson, having been laid off as a still-probationary employee, would have lost all accumulated time toward seniority, and Morrow would have taken over the job. But we do not understand Sanderson to insist on this type of enforcement of his rights under the collective agreement; he did not and does not insist that he had a contractual right to be laid off permanently before attaining seniority. As a practical matter, if the Union was to avoid advocating Sanderson's termination before he attained seniority, it was faced with the necessity of attempting some reconciliation between two conflicting contract provisions, one of which would give Sanderson, the other Morrow, superior seniority as a painter-glazier. The choice was whether to abide by the letter of the date-of-entry provision and leave Sanderson the senior painter-glazier, or to accord greater weight to the promotion-from-within policy and somehow give effect to Morrow's prior claim. In the unique circumstances of this dispute, the Union agreed with Ford that Morrow's prior right to the job should override the written provision fixing each employee's date-of-entry. This solution was a departure from the strict wording of the written contract provision, but the other alternative would have contravened the promotion-from-within policy. The settlement did not diminish Sanderson's seniority rights except vis-a-vis Morrow, and did not depart from the date-of-entry provision except to the extent necessary to effect the accommodation. We hold that under these circumstances, the district court could not properly conclude as a matter of law that the settlement agreed to by the Union clearly exceeded the bounds of fair interpretation of the collective contract.
 
 
 36
 Since we conclude the Union's action did not clearly contravene the collective agreement, we do not reach the further questions whether such conduct would be arbitrary[14] as a matter of law and constitute a breach of the Union's duty of fair representation,[15] and what effect employee consent to an ad hoc arrangement in clear contravention of the contract might have.[16]
 
 
 37
 It is well settled that when, as in this case, the union has authority to act as exclusive bargaining agent and it has not acted in clear disregard of the contract its mere refusal to press a grievance to the final procedural stage set out in the agreement does not alone constitute a breach of its duty of fair representation. Vaca v. Sipes, supra; Turner v. Air Transport Dispatchers, 5th Cir. 1972, 468 F.2d 297. When the union thus abandons a grievance in a permissible exercise of its discretion, the employee's consent is not required and is not determinative of the issue whether the union breached its duty to the employee. We agree with appellants that the question of Sanderson's consent did not belong in the case as a determinative issue and that the question whether the Union acted arbitrarily, discriminatorily, or in bad faith was one for the jury and could not be resolved as a matter of law on the record in this case. Since, as we have noted above, the instructions had the effect of keeping the fair representation issue from the jury, the judgment below must be reversed and the case remanded for a new trial under proper jury instructions.
 
 IV. Statute of Limitations
 
 38
 The Union contends that the applicable Alabama one-year statute of limitations for tort claims bars Sanderson's fair representation action against the Union, since the Union's acts complained of occurred before August 6, 1969, and suit was not filed until October 13, 1970, over fourteen months later. The parties agree that 7 Code of Alabama Sec. 26 applies; it prescribes a one-year limitation period for "Actions for any injury to the person or rights of another, not arising from contract, and not herein specifically enumerated." The First Circuit has held that the state statute of limitations for tort actions should apply to fair representation actions and has persuasively rejected an attempt to characterize a fair representation suit as a contract action. De Arroyo v. Sindicato De Trabajadores Packing House, AFL-CIO, 1st Cir. 1970, 425 F.2d 281, 285-289; see also Tippett v. Liggett & Myers Tobacco Co., N.D.N. C.1970, 316 F.Supp. 292, 297-298. We are in accord with this approach and agree that the Alabama one-year statute is the applicable one for this type of case.
 
 
 39
 The Union's limitations argument must fail, however, for two reasons. First, the acts and omissions of the Union of which Sanderson complained did not all take place before August 6, 1969. One of the most important aspects of the Union's alleged breach of its duty of fair representation was its failure to process Sanderson's grievance after his October 20, 1969, seniority lay-off. This part of the alleged breach of duty necessarily took place after October 20, 1969, less than one year before suit against the Union was filed on October 13, 1970. Secondly, the Alabama one-year statute "begins to run when the injury happens or damage accrues, and not from the date of the act causing the injury or damage." Brotherhood of Locomotive Firemen & Engineer-men v. Hammett, 1962, 273 Ala. 397, 140 So.2d 832; accord Central Georgia Railway v. Jones, 5th Cir. 1956, 229 F.2d 648, cert. denied, 352 U.S. 848, 77 S.Ct. 32, 1 L.Ed.2d 59. In this case the limitation period began to run on October 20, 1969, the date of Sanderson's seniority lay-off, less than one year before suit was filed on October 13, 1970. Thus, the statute of limitations will not bar retrial of the action against the Union on remand.
 
 
 40
 Reversed and remanded.
 
 
 41
 GROOMS, District Judge (concurring in part and dissenting in part):
 
 
 42
 I disagree with the majority in the holding that the question of Sanderson's consent did not belong in the case as a determinative issue. Nor do I construe the court's charge as resolving the issue of arbitrariness, discrimination and bad faith as a matter of law.
 
 
 43
 Each of the complaints charge in material substance that plaintiff's alleged wrongful discharge was based upon the letter agreement of August 6, 1969, wherein Morrow was granted occupational group seniority antedating that of the plaintiff and that plaintiff's signature to that agreement was fraudulently obtained.
 
 
 44
 The answers state that the letter agreement disposed of plaintiff's grievance, and that such agreement was binding on the plaintiff and barred his claim. The pretrial order confirms the centrality of the issue thus presented. The defense of the statute of limitations was clearly unsustainable. The heart issue as I view it from the record was whether the contract was validly modified by the voluntary consent of plaintiff, Sanderson.
 
 
 45
 The fact that the parties attempted to formalize their understanding by the letter of August 6 was a recognition that Ford and the Union could not alter Sanderson's and Morrow's seniority rights without their concurrence.
 
 
 46
 It was in the light of the issue thus framed and the act of the parties thus consummated that the court charged that "the question arises as to whether Mr. Sanderson is bound by that agreement on principles of waiver or estoppel," and then added, "I charge you as a matter of law Ford and the Union could not have altered Mr. Morrow's seniority date in violation of the terms of the contract without the concurrence of Mr. Morrow and Mr. Sanderson."
 
 
 47
 I do not quarrel with the majority that Ford's promotion-from-within policy must be considered as a part of the collective bargaining contract and that recognition of that policy was implicit in Article IV. Section 2(a) of the written agreement.
 
 
 48
 It appears to me that by the use of the words "terms of the contract," instead of "collective bargaining contract," words of a more restrictive description, the court encompassed everything that constituted the contract, explicit and implicit, including the promotion-from-within policy. I am therefore of the opinion that a bifurcation of the contract which results in a holding that the court's charge was erroneous is an unmerited refinement.
 
 
 49
 The court fully presented to the jury the issue of whether the plaintiff voluntarily entered into and executed the letter agreement and whether it was altered after the plaintiff signed it. The court with clarity then presented to the jury the issue of fair representation on the part of the Union in procuring Sanderson's concurrence in and signature to the agreement.
 
 
 50
 The court specifically charged that the Union was under a statutory obligation "to serve the interest of all members without hostility or discrimination toward any, to exercise this discretion with complete good faith and honesty, and to avoid arbitrary conduct . . . . A breach of the statutory duties of fair representation occurs only when a Union's conduct toward a member of the Collective Bargaining Unit is either arbitrary, discriminatory or in bad faith. . . . they are obligated not to act in an arbitrary manner or to discriminate against one of the members of the Union or to exercise bad faith in adjusting disputes involving its members."
 
 
 51
 I am of the opinion that within the framework of the issues presented and litigated, and considering the charge as a whole in its application to the issues and the evidence, the court did not err in its charge. I would affirm. I therefore respectfully dissent in the particulars herein indicated.
 
 
 52
 I concur in the Court's decision with respect to the statute of limitations.
 
 
 53
 ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC
 
 PER CURIAM:
 
 54
 The Petition for Rehearing is denied and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is also denied.
 
 
 55
 GROOMS, District Judge (dissenting): I dissent from the denial of the Petition for Rehearing and Petition for Rehearing En Banc.
 
 
 
 [1]
 United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, Local Union No. 255
 
 
 [2]
 Ford and the International Union signed a major collective bargaining agreement dated October 25, 1967, which contemplated supplemental agreements between Ford and the local unions with regard to seniority groups. Two such local agreements regarding seniority at the Sheffield plant were made and became effective on October 30, 1967 and on November 30, 1967. These three agreements contained the seniority provisions which are at the center of this controversy
 
 
 [3]
 As published in 1969 in Ford's Industrial Relations Administration Manual, Vol. V, the policy reads:
 I. Promotion From Within
 A. It is the policy of the Company to provide hourly employes with every opportunity for advancement and self-improvement through promotions from within the organization. Therefore, as openings occur within the plant, first consideration should be given to employes who qualify for such positions.
 B. Promotion from within is beneficial to the Company in the following ways: (1) it enables Management to further use the skills of experienced employes; (2) it enables the Company to attract and retain competent employes through consistent and fair application of the promotion policy and (3) the prospect of advancement favorably affects an employe's willingness to perform to the best of his ability.
 C. The following are guides for Management when promoting employes to more responsible type of work.
 
 
 [1]
 Employes should be given equal consideration for promotion regardless of their race, creed, color, or national origin
 
 
 [2]
 Promotions are made based on merit and ability. When these factors are equal among two or more employes, then the employe having the greatest seniority is given preference. Merit and ability takes into consideration such factors as experience, training, quality of workmanship, attendance, conduct and safety
 
 
 [3]
 Applicants should be interviewed to demonstrate the Company's interest in employes as well as providing information valuable in making the proper selection. Also, when possible, the unsuccessful candidates should be informed why another employe was selected
 
 
 [4]
 Management must be prepared to support a promotion with specific concrete evidence since the Union may challenge this decision through the grievance procedure
 D. Where time permits, the Union should be notified as far in advance as possible with respect to promotional openings. The Form 3466, Notice of Hourly Employe Opening, is used to notify the Union of the existing openings.
 
 
 [4]
 The entire provision, which is Article IV, Section 2(a) of the Collective Bargaining Agreement of October 25, 1967 reads:
 Section 2. Promotions and Nonpromotional Job Transfers
 (a) Promotions
 Promotions shall be based primarily upon merit and ability, but where these are equal, the employe having the greatest seniority shall receive preference.
 With respect to promotions to higher paid jobs, where time permits, the Union shall be notified of the opening, and as far in advance as possible. Arrangements shall be made locally by mutual agreement to establish appropriate procedures for posting of such openings. By local agreement, other arrangements can be made regarding any job openings.
 Complaints that Management has not exercised fairness in judging the qualifications of the available candidates may be processed through the Grievance Procedure.
 
 
 [5]
 It is not clear from the briefs or the record whether or how the negotiations are to be classified under the four-step grievance procedure set out in the collective bargaining agreements. Sanderson protested his lay-off to several Ford and Union officials and attempted to grieve it; it appears, however, that in arriving at the settlement of the controversy between Sanderson and Morrow the Company and Union officials followed the contract procedures only quite loosely if at all
 It is clear, however, that the Union worked for and achieved an agreement with Ford to settle the matter, and that after this "settlement" the Union refused to pursue the matter to arbitration despite Sanderson's continuing attempts to press for a result more favorable to him.
 
 
 [6]
 When a probationary employee is "reinstated" rather than "rehired," he is credited with time he has previously accumulated on the job toward seniority. Thus, immediately before the August 4 reinstatement Sanderson needed four days to attain seniority with a date of entry of April 21, 1969, the date he began on the job
 
 
 [7]
 Strictly speaking, on August 6, 1969 Sanderson did not have seniority; rather he had accumulated time on the job which might mature into seniority with one additional day's work. On the following day, August 7, Sanderson completed three months of work on the job and thus became a painter-glazier with seniority under the terms of the collective bargaining agreements
 
 
 [8]
 See interrogatories I and II, quoted in the text, infra
 
 
 [9]
 The collective bargaining agreement provides, "The order of lay-off and recall shall be governed by first, seniority of employment, and second, ability." Appellants make no claim that considerations of ability caused Sanderson to be laid off before Morrow; it is undisputed that seniority was the decisive factor
 
 
 [10]
 Plaintiff's amended complaint in the suit against the Union contains no allegation of a separate jurisdictional basis for the action against the Union for wrongfully inducing Ford to breach the collective bargaining agreement. This wrongful-inducement action was alleged in a separate count, and the district court presented it to the jury in a separate interrogatory, but the parties have not treated it on this appeal as an action distinct from the unfair-representation action. We perceive no significant difference between the two counts, and we consider the wrongful-inducement count to be a part of, or coextensive with, the unfair-representation count, and not a separate cause of action
 
 
 [11]
 An important part of the context was the charge given under the third interrogatory:
 The third interrogatory is did the defendant Union wrongfully induce defendant Ford to breach its collective bargaining agreement by laying plaintiff off and retaining Morrow when in fact plaintiff's seniority was superior.
 And I charge you with respect to that interrogatory that eliminating the letter agreement of August 6, 1969, assuming you have found that the agreement was altered or that it was not voluntarily signed by Mr. Sanderson, under the terms of the contract Mr. Sanderson had an occupational group seniority date of April 21, 1969. Under the terms of the contract Mr. Morrow had an occupational group seniority date of August 4, 1969, and when in October, 1969 there arose the necessity for a layoff, I charge you that but for the letter agreement of August 6, 1969, Ford did breach its contract which had been negotiated between it and the Union. And if you find that Ford did breach its contract and that it did it upon the inducement or persuasion of the Union, then both Ford and the Union would be liable to the plaintiff in damages.
 The jury was thus instructed that Ford and the Union must be found liable unless Sanderson consented to the settlement.
 
 
 [12]
 See note 4, supra & accompanying text
 
 
 [13]
 Sanderson argues that Morrow could derive no superior claim to the painter-glazier job based on the promotion-from-within policy because the policy logically could not apply to job competition between two employees, but only to competition between an employee and an "outsider." We think this logic is based on an unduly narrow view of the policy and the facts. Of course, at the time Sanderson was laid off on July 17, 1969, four work days before attaining seniority, Morrow and Sanderson were both Ford employees, but Morrow's claim was based on the state of affairs that existed when Sanderson, as an outsider, received the painter-glazier job originally on April 21, 1969, and the subsequent events which allowed the job to become a permanent one. Whether the promotion-from-within policy conferred on Morrow a continuing superior claim to the job until Sanderson actually attained seniority was itself legitimately a matter for interpretation. Where, as in this case, a "term" of the collective contract is supplied by the agreement and conduct of the parties outside the written contract, and this term is conclusively shown to be a bona fide additional term accepted by the employer and the union, then the interpretation placed on it by the employer and the union should be accorded some weight. We do not believe that their construction of the promotion-from-within policy as a basis for Morrow's superior claim to the job can be said as a matter of law to be beyond the bounds of reasonable interpretation
 
 
 [14]
 Cf. Griffin v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, 4th Cir. 1972, 469 F.2d 181; De Arroyo v. Sindicato De Trabajadores Packinghouse, AFL-CIO, 1st Cir. 1970, 425 F.2d 281; Local 4076, United Steel Workers of America v. United Steel Workers of America, AFL-CIO, 338 F. Supp. 1154 (W.D.Pa.1972)
 
 
 [15]
 This problem is treated in the following authorities: Humphrey v. Moore, 1964, 375 U.S. 335, 84 S.Ct. 363, 11 L. Ed.2d 370 (Justice Goldberg concurring); Tobias, A Plea for the Wrongfully Discharged Employee Abandoned by His Union, 41 U.Cinn.L.Rev. 55 (1972); Levy, The Collective Bargaining Agreement as a Limitation on Union Control of Employee Grievances, 118 U.Pa.L.Rev. 1036 (1970); Lewis, Fair Representation in Grievance Administration; Vaca v. Sipes, 1967, S.Ct.Rev. 81; Comment, Federal Protection of Individual Rights Under Labor Contracts, 73 Yale L.J. 1215 (1964); Summers, Individual Rights in Collective Agreements and Arbitration, 37 N.Y.U.L.Rev. 362 (1962); Cox, Rights Under a Labor Agreement, 69 Harv.L.Rev. 601 (1956)
 
 
 [16]
 Cf. Order of Railroad Telegraphers v. Railway Express Agency, Inc., 1944, 321 U.S. 342, 64 S.Ct. 582, 88 L.Ed. 788; J. I. Case Company v. National Labor Relations Board, 1944, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762