Charlie L. CRAIG et al., Plaintiffs,

v.

BEMIS COMPANY, INC., a corpora-
tion, et al., Defendants.

Civ. A. No. 7738–73–H.

United States District Court,
S. D. Alabama, S. D.

March 7, 1974.

J. U. Blacksher, Mobile, Ala., for plaintiff.

Paul W. Brock, Mobile, Ala. and Curtis L. Roy, Minneapolis, Minn., for Bemis Company, Inc.

William E. Mitch, Birmingham, Ala., for United Paperworkers International Union, AFL-CIO.

Irwin W. Coleman, Jr., Mobile, Ala. and Donald J. Gavin, Tax Div. Dept. of Justice, Washington, D. C., for Donald Alexander, Commissioner of Int. Rev.

## ORDER ON SUMMARY JUDGMENT
### FINDINGS OF FACT
### THE PARTIES

HAND, District Judge.

1. Plaintiffs are citizens and residents of the State of Alabama, who were formerly employed by Bemis at Mobile, Alabama. [Complaint, Para. IV; Answer, Para. IV].

2. Defendant Bemis Company, Inc. (Bemis) is a Missouri corporation with its corporate headquarters located in Minnesota. Prior to March 6, 1972, Bemis operated a manufacturing plant in Mobile at which plaintiffs were employees. [Complaint, Para. I-B, V-A; Bemis' Answer to plaintiffs' Interrogatory No. 1].

3. Defendant United Paperworkers International Union, AFL–CIO, formerly known as the International Brotherhood of Pulp, Sulphite and Paper Mill Workers, AFL–CIO (hereafter referred to as defendant Union) is a labor organization and the parent of Local 480, which is now defunct. Defendant Union and Local 480, acting jointly, were the collective bargaining representatives of the production and maintenance employees (including plaintiffs) at Bemis' plant in Mobile, Alabama. [Complaint, Para. II and V-B; Bemis' Answer, Para. V-B].

4. Defendant, Donald Alexander, is the Commissioner of Internal Revenue of the United States. [Complaint, Para. V-C; Bemis' Answer, Para. V-C].

### THE MOBILE PLANT

5. Bemis' plant in Mobile, Alabama first began operations in May 1943. The plant manufactured multiwall paper bags for use in packaging. The Mobile plant was one of a group of Bemis' plants which collectively formed the "Packaging Group". [Affidavit of George W. Finlay].

6. Since 1944, the production and maintenance employees at Bemis' Mobile plant were represented for collective bargaining purposes by defendant Union and its predecessors. [Affidavit of George W. Finlay].

### BEMIS HOURLY RETIREMENT PLAN

7. The Bemis Hourly Retirement Plan is a single pension plan covering hourly-compensated employees in a number of Bemis' plants. The Plan was first adopted on October 24, 1962, but was made effective as of July 1, 1962. As of July 1, 1973, the Bemis Hourly Retirement Plan covered some 5,790 participants at 29 Bemis plants across the country. [Affidavit of William Fitzgerald, Exhibit A; Affidavit of Earle J. Niederluecke, Exhibit J].

8. With respect to Bemis' plants at which the employees are represented by a union, the Bemis Hourly Retirement Plan becomes effective only upon approval of that union. Paragraph 1.09 of the Plan provides—:

". . . provided that an employee in a bargaining unit represented by a union shall become a participant only if This Plan is approved by the union."

In practical operation, approval of the Plan by a union occurred through collective bargaining. [Affidavit of Earle J. Niederluecke, Exhibit J, Paragraph 1.-09].

9. On November 1, 1962, the Bemis Hourly Retirement Plan was adopted for the Mobile Plant. This occurred through the medium of a Retirement Plan Agreement entered into between Bemis and the predecessors of defendant Union. At the same time, Bemis and the Union entered into a collective bargaining agreement, which was effective from 1962 to 1964. The only provision of that collective bargaining agreement relating to the subject of pensions stated:

"The parties have entered into a Retirement Plan Agreement effective November 1, 1962."

[Affidavit of Lawrence E. Schwanke, Exhibit D and E].

10. In 1964, Bemis and the Union entered into a collective bargaining agreement to replace the 1962 agreement. The only provision relating to pensions in that agreement stated—

"The parties entered into a Retirement Plan Agreement effective November 1, 1962."

In 1966, Bemis and the Union entered into a collective bargaining agreement to replace the 1964 agreement. The only provision relating to pensions in that agreement stated—

"The Retirement Plan agreed upon November 1, 1962 remains in effect."

[Affidavit of Lawrence E. Schwanke, Exhibit F and G].

11. In 1969, Bemis and the Union entered into a collective bargaining agreement to replace the 1966 agreement. The only provision of the 1968 agreement relating to pensions contained the following statement—

"The Retirement Plan agreed upon November 1, 1962 remains in effect except that benefits will be changed as follows:"

This was followed by language increasing the level of benefits for Mobile employees. [Affidavit of Lawrence E. Schwanke, Exhibit H].

## VESTING PROVISIONS

12. The Bemis Hourly Retirement Plan as originally adopted in 1962 provided that an employee would have a vested benefit upon completing twenty years of credited service and attaining fifty-five years of age. [Affidavit of Earle J. Niederluecke, Exhibit J (Section 10)].

13. In 1967, the Bemis Hourly Retirement Plan was amended to permit an employee to obtain a vested pension upon completion of thirty years of credited service, and without regard to his or her age. Such vesting provision was an alternative to the original vesting provision which required twenty years of credited service and the attainment of age fifty-five. [Affidavit of Earle J. Niederluecke, Exhibit K].

14. The amended provision respecting vesting was not adopted for the employees at the Mobile plant, as is evidenced by the fact that the 1969 collective bargaining agreement stated, "The Retirement Plan agreed upon November 1, 1962 remains in effect . . . ." In any event, even if the alternative vesting provision had been adopted for the Mobile plant, it would have had no effect on the rights of any Mobile employee. Under the alternative vesting provision, an employee would have a vested right upon completion of thirty years of credited service, without regard to age. No Mobile employee could have met that requirement, since the Mobile plant was in operation less than thirty years from the time it was established in 1943 until it closed in 1972.

## THE CLOSING OF THE MOBILE PLANT

15. The collective bargaining agreement entered into in 1969 expired on January 19, 1972. On February 4, 1972, the production and maintenance employees at the Mobile plant went on strike. [Affidavit of Lawrence E. Schwanke; Affidavit of George W. Finlay].

16. On February 24, 1972, Bemis' representatives advised the Union of the tentative decision to close the Mobile plant. The subject was discussed thoroughly at that meeting and at subsequent meetings held on February 28 and March 3, 1972. All three meetings were held under the auspices of the Federal Mediation and Conciliation Service at the Federal Building in Mobile. Initially, the Union representatives attempted

to dissuade the Company from closing the Mobile plant. Company representatives advised the Union of the seriousness of the economic circumstances, which were beyond the power of the Union and the employees to remedy. Thereupon the Company and Union negotiators turned their attention to the negotiation of a Plant Closing Agreement. [Affidavit of George W. Finlay, Exhibit P; Affidavit of Lawrence E. Schwanke].

17. Bemis' decision to close the Mobile plant on a permanent basis had the effect of blunting the Union's principal economic weapon. A union cannot exert much economic pressure by engaging in a strike against a plant which is about to close. [Affidavit of Lawrence E. Schwanke].

18. On March 6, 1972, Bemis and the Union entered into a Plant Closing Agreement. Among other things, the Plant Closing Agreement provided for the cessation of the strike, the payment of severance pay, the continuation of insurance coverage for a specified period, and preferential re-employment in the event the Mobile plant were re-established within two years. [Affidavit of Lawrence E. Schwanke, Exhibit I].

19. On the subject of pensions, the Plant Closing Agreement provided that the employees "will receive all benefits for which they are eligible under the provisions of the current Bemis Hourly Retirement Plan", specifically providing that such benefits would be calculated on the basis of $3.50 per month per year of service. [Affidavit of Lawrence E. Schwanke, Exhibit I (Para. 5)].

## EFFECT OF PLANT CLOSING ON PENSIONS

20. The rights of plaintiffs under the Bemis Hourly Retirement Plan are to be determined by the provisions of that Plan. At the time of the closing of the Mobile plant, 47 employees met the vesting requirements of the Bemis Hourly Retirement Plan, and are presently being paid benefits in accordance therewith. These include the following plaintiffs:

| | |
|---|---|
| Mr. Jessie E. Morrissette | Mrs. Frances Mitchell |
| Mrs. Ettie M. Roney | Mrs. Carlus Clark (listed on Complaint as Corlus Clark) |
| Mrs. Estelle H. Ardis | |
| Mr. Joseph W. Waite (listed on Complaint as Warren Waite) | Mr. Phillip Portis |
| | Mr. Earl Parmer |
| Mrs. Effie C. Goins (listed on Complaint as Effie Gains) | Mr. Sherman Cornelison |
| | Mrs. Gladys Zellers |
| Mrs. Inez Perry | Mr. Edward Womack |
| Miss Mary Goodman | Mr. George Goodwin |
| Mrs. Olive Skelton (listed on Complaint as Oline Skelton) | Miss Vivian Allen |
| | Mr. Woodrow Murphy |
| Mrs. Roxie Malone | Mr. Robert Falls |
| Mrs. Ruby Roberts | Mrs. Hazel Falls |
| Mrs. Willie Moore | Mr. Thomas Duke |
| Mrs. Vera Rogers | |

The other employees (including the other plaintiffs) did not meet the vesting requirements of the Bemis Hourly Retirement Plan in that they had not completed twenty years of credited service and/or had not attained the age of fifty-five years. [Exhibit C attached to the affidavit of William Fitzgerald; Exhibit C is the list of persons receiving pension benefits under the Plan; the persons having a "Ret. Date" of March 1972 retired when the plant closed].

21. The Bemis Hourly Retirement Plan specifically provides that no participant in the Plan is entitled to benefits if his or her service as an employee is terminated before the participant has met the vesting requirements of the Plan. [Affidavit of Earle J. Niederluecke, Exhibit J, Section 11, page 11].

22. Bemis' action in closing the Mobile plant did not violate any collective bargaining agreement, the Plant Closing Agreement, nor the Bemis Hourly Retirement Plan. None of these instruments contained any contractual commitment precluding Bemis from closing the plant, nor do any of these instruments purport to guarantee employment to any individual until such time as he or she meets the vesting requirements of the Plan. None of these instruments guarantees pension benefits for any employee who loses his employment due to

the closing of the plant before he has met the vesting requirements of the Plan.

23. The Bemis Hourly Retirement Plan contains detailed provisions which specify the purposes for which the assets of the fund will be used upon the termination of the entire Plan. [Affidavit of Earle J. Niederluecke, Exhibit J, Section 15.02].

24. The closing of the Mobile Plant did not result in a termination of the entire Plan. As of March 6, 1972, the date on which the Mobile plant closed, there were some twenty-seven other Bemis plants, the hourly employees of which were participants in the Bemis Hourly Retirement Plan. The number of participants in those twenty-seven plants totaled approximately 4,708 persons. There were 242 production and maintenance employees at Mobile who were covered by the Plan when the plant closed.

[Affidavit of William Fitzgerald, Exhibit A; Affidavit of Lawrence E. Schwanke, Exhibit B. Exhibit B is a list of the employees as of Feb. 3, 1972, the day before the strike began and the last work day before the plant closed.]

## FUNDING THE MOBILE PENSIONS

25. Each year, Bemis' actuaries make a valuation to ascertain the amount of liability (present and future) under the Plan and to determine the amount of money which Bemis must contribute to fund those liabilities on a sound, actuarial basis. Since the BHRP covers 29 plants, and there are variations from plant to plant, the actuaries determine the amount of money which Bemis must contribute to fund the Plan for each plant as a separate unit. These amounts are then summed, and the total is the amount which Bemis must contribute to fund the Plan as a whole. [Affidavit of Ernest G. Dawson].

26. From 1962 through 1969, the benefit level in effect at the Mobile plant was $1.50 per month times the number of years of credited service the participant had completed. As a result of collective bargaining, the benefit amount was increased to $3.00 per month per year of credited service in January 1970. In January 1971, also as the result of collective bargaining, the benefit amount was further increased to $3.50 per month per year of credited service. Each time the benefit amount was increased, the increase was applied to years of credited service prior to the date of the increase. The result of these increases in benefit amount was the creation of an unfunded past service liability at the Mobile plant. [Affidavit of Ernest G. Dawson; Exhibits H and H–1].

27. From 1962 until July 1, 1969, the contributions to the trust fund on account of the Mobile plant were the amounts needed to fund a pension based on a benefit amount of $1.50 per month per year of credited service. When the monthly benefit amount was increased to $3.00 in 1970, and to $3.50 in 1971, the assets of the trust fund attributable to the Mobile plant were insufficient to pay the pension liabilities which had accrued as a result of years of prior service by Mobile employees, at the new higher benefit levels. [Affidavit of Ernest G. Dawson].

28. Under Section 404(a)(1)(C) of the Internal Revenue Code of 1954, a corporation cannot deduct, as a business expense, more than one-tenth of its past service liability base in any one year. [Affidavit of Ernest G. Dawson].

29. July 1, 1971 was the last valuation date for the BHRP prior to closing of the Mobile plant. As of that date, the portion of the trust fund attributable to Mobile totaled $314,457. The accrued pension liabilities at the Mobile plant as of that date totaled $851,608. The accrued *vested* liabilities for the Mobile plant (i. e., the liability on account of present pensioners and employees whose pension interests have vested) was the sum of $557,589. as of July 1, 1971. Therefore, a comparison of assets attributable to Mobile against the accrued vested liabilities for Mobile

resulted in a deficit of $243,132 as of July 1, 1971. As of March 6, 1972 (the date of the closing of the Mobile plant), the assets of the fund attributable to Mobile were insufficient to cover accrued vested liabilities, the amount of such deficit being not less than $200,000. [Affidavit of Ernest G. Dawson].

30. Benefit levels have been increased from time to time through collective bargaining at the various other Bemis plants covered by the BHRP. These increases in benefit amount have been applied to prior years of credited service at those plants, with the result that there has been created an unfunded past service liability in the Plan as a whole. As a consequence, the total accrued vested pension liabilities at all Bemis plants covered by the BHRP, is substantially greater than the total value of the assets of the Plan as a whole. [Affidavit of Ernest G. Dawson; Exhibit R–1, R–2 and R–3].

31. Had Bemis construed the closing of the Mobile plant as a partial termination, Bemis would not have been required to make further contributions to the Fund on account of Mobile. Had this course been followed, the assets of the Fund attributable to Mobile would have been at least $200,000 less than the accrued *vested* pension liabilities for Mobile employees. [Affidavit of Ernest G. Dawson].

32. Had the closing of the Mobile plant been treated as a partial termination, and the assets of the trust fund attributable to Mobile distributed, those assets would have been insufficient to pay full pension benefits to persons whose pension rights had already vested. If these assets were used to provide benefits for persons who did not meet the vesting requirements of the Plan, such a diversion of funds would reduce the amount of money available to pay pension benefits to persons whose rights had vested. [Affidavit of Ernest G. Dawson].

33. Bemis has not treated the closing of the Mobile plant as a partial termina-

tion of the Plan. As a result, Bemis must contribute additional monies to the BHRP, after the closing of the Mobile plant, to fund the pensions for Mobile employees whose rights had vested as of the date the plant closed. The aggregate amount of the monies which Bemis must contribute is not less than $200,000, which was the amount of the deficit (Mobile assets as compared with accrued vested pension liability at Mobile) as of the date the plant closed. [Affidavit of Ernest G. Dawson].

## SEVERANCE AND VACATION PAY

34. The Plant Closing Agreement provided for the payment of severance pay in accordance with a formula specified in that Agreement. In connection therewith, the Plant Closing Agreement provided—

> "All of the obligations of the Company for vacation pay are fulfilled by these severance pay provisions."

[Affidavit of Lawrence E. Schwanke, Exhibit I (Page 3)].

35. Severance pay was a new benefit not provided for in any previous collective bargaining agreement. The purpose of the severance pay was to alleviate hardship which employees would suffer through the closing of the plant. With the plant being closed, employees would not be taking any further vacations in the sense of time off from their jobs. Under these circumstances it was deemed appropriate to provide a lump sum payment to cover both vacation pay and severance pay. It was recognized that a few employees might have taken their vacation earlier in the year. However, all employees had been without paychecks for some four weeks due to the strike; hence, the need for a severance paycheck was common to all employees. Therefore, the agreement was that severance pay (which covered vacation pay also) would be paid to all employees, including those who might have received vacation pay earlier. [Affidavit of Lawrence E. Schwanke].

36. Each employee who would have been entitled to vacation pay in 1972, re-

ceived severance pay which exceeded the amount of such vacation pay. [Affidavit of Lawrence E. Schwanke].

37. Each plaintiff has been paid severance pay in accordance with the formula set forth in the Plant Closing Agreement. Inasmuch as the Plant Closing Agreement provides that "[a]ll of the obligations of the Company for vacation pay are fulfilled by these several pay provisions", plaintiffs are not entitled to additional monies on account of any claims for vacation pay.

## FAIR REPRESENTATION

38. The Bemis Hourly Retirement Plan was first adopted for the Mobile plant as the result of collective bargaining in 1962. The 1969 Collective Bargaining Agreement was the last such agreement applicable to Mobile (excluding the Plant Closing Agreement).

39. The actions of defendant Union and its predecessors in agreeing to the vesting requirements of the Bemis Hourly Retirement Plan were not arbitrary and capricious, were not obviously irrelevant and invidious, and did not amount to unfair representation of the Mobile employees.

40. By agreeing to the Plant Closing Agreement specifying that Mobile employees would receive all benefits for which they are eligible under the Bemis Hourly Retirement Plan, defendant Union did not act in an arbitrary or capricious manner.

41. Bemis did not violate any provisions of the Bemis Hourly Retirement Plan, any collective bargaining agreement, or the Plant Closing Agreement by refusing to provide pension benefits to Mobile employees who did not meet the vesting requirements of the Plan. Defendant Union did not violate any duties of fair representation by refusing to prosecute claims which contended Bemis had violated such agreements.

42. Defendant Union did not act in an arbitrary and capricious manner by agreeing to a Plant Closing Agreement which provided that the payment of severance pay fulfilled Bemis' obligations for vacation pay. The fact that some Mobile employees had received vacation pay earlier in the year does not make the Plant Closing Agreement arbitrary or capricious, and does not mean that the Union violated its duty of fair representation.

43. Bemis did not violate any agreement by refusing to pay vacation pay to plaintiffs. The fact that defendant Union has refused to prosecute claims for vacation pay on behalf of employees who received severance pay does not amount to unfair representation, and is not discriminatory and invidious conduct.

44. In negotiations concerning the Bemis Hourly Retirement Plan, and in negotiations concerning the Plant Closing Agreement, defendant Union and its predecessors were acting as the exclusive bargaining representative of the maintenance and production employees at Bemis' Mobile plant.

45. As the bargaining representative of the Mobile employees, defendant Union is vested by law with authority to exercise a wide range of discretion and reasonableness. No evidence has been presented indicating that defendant Union and its predecessors exercised this authority in bad faith or with dishonesty of purpose. No evidence has been presented of any fraud or deceitful action. No evidence has been presented showing that the Union was motivated by any hostility to any group.

46. During such negotiations, Bemis relied upon the status and the position of the Union as the recognized bargaining agent of the Mobile employees. At no time was Bemis advised that the Union lacked authority to enter into agreements which would be binding upon the

employees. At all times, Bemis believed that the Union was fairly and aggressively representing the interests of the production and maintenance employees at Mobile. [Affidavit of Lawrence E. Schwanke].

## ESTOPPEL AND STATUTE OF LIMITATIONS

■ 47. Having accepted the benefits of the Plant Closing Agreement, plaintiffs are estopped from denying the binding effect of the provisions of that Agreement which bar plaintiffs' claims. The Plant Closing Agreement provides that the employee receiving severance pay "shall relinquish all seniority and other employment rights with the Company". Plaintiffs have not tendered the return of the severance pay monies which they received. [Affidavit of Lawrence E. Schwanke, Exhibit I, para. 4].

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and over the subject matter of this action.

2. There are no genuine issues of material fact, and the case is in a proper procedural posture for summary judgment.

3. Those plaintiffs who met the vesting requirements of the Bemis Hourly Retirement Plan are receiving benefits in accordance therewith. The remaining plaintiffs are not entitled to pension benefits, since they do not meet the vesting requirements of the Bemis Hourly Retirement Plan.

4. Having received severance pay, plaintiffs are not entitled to additional compensation as and for vacation pay.

5. Defendant Union did not violate its duty of fair representation.

6. The claims asserted in the Complaint are barred by the Alabama one year statute of limitations, being Title 7, Section 26, Code of Alabama of 1940, as last amended and recompiled. Sanderson v. Ford, 5 Cir., 483 F.2d 102 (1973).

7. Bemis is entitled to summary judgment against plaintiffs, together with Bemis' costs and disbursements herein.

## ORDER

On July 2, 1973 the plaintiffs filed this action for declaratory judgment and for preliminary and permanent injunction for violation of a labor contract between the parties, pursuant to Title 29, U.S.C., Section 185 and Title 28 U.S.C., Section 2201. The allegations against the defendant, United Paperworkers International Union, AFL–CIO, were that the Union failed to "fairly represent" the plaintiffs when they negotiated and entered into a "Plant Closing Agreement" on March 6, 1972.

Defendant, United Paperworkers International Union filed on July 20, 1973 a motion to dismiss as the complaint failed to state a claim for which relief could be granted, and subsequently thereto orally amended the motion to include the issue that from the face of the complaint the action is barred by the statute of limitations.

The motion was taken under submission by the Court at the request of the parties until all parties have filed their respective motions.

At the hearing on said motion in August 1973 the plaintiffs were informed they could amend their complaint, but they have indicated no desire to do so or an inability to do so.

The only allegation of the complaint as to the Union's breach of duty is: "The Defendant Union has violated its duty to fairly and aggressively represent Plaintiffs and their class and has breached its fiduciary duties."

It is settled that a breach of the Union's duty of fair representation "occurs

only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842; Sanderson v. Ford Motor Co. and United Automobile, etc. Workers, 483 F.2d 102 (5th Cir. 1973).

The Fourth Circuit in Lusk v. Eastern Products Corp., 427 F.2d 705 (4th Cir.) upheld the dismissal of a complaint attempting to allege a breach of a Union's duty of fair representation where, as here:

". . . the allegations of a [the] complaint alleging a breach of a union's duty of fair representation [did not] contain more than conclusory statements alleging improper representation; conclusory allegations without specifying supporting facts to show the union's lack of good faith fail to state a valid claim." Lusk v. Eastern Products Corp., *supra* at p. 708

■ ■ Alabama's one year statute of limitations applies to fair representation actions against unions. Title 7, Section 26, Code of Alabama 1940; Sanderson v. Ford, 5 Cir., 483 F.2d 102. This one year begins to run at the time the injury happens or damage occurs; as alleged in the complaint the damage occurred at the time the contract was signed on March 6, 1972 (Plant Closing Agreement) when the pension benefits were terminated for the non-vested employees. Thus, the period involved was in excess of one year from the date the damage or injury occurred until June 2, 1973, the date the complaint was filed; therefore, it is

Ordered, adjudged and decreed that the motion of the defendant, United Paperworkers International Union, AFL–CIO, to dismiss the complaint is due to be and is hereby granted.