840 F.2d 283
 130 L.R.R.M. (BNA) 2129, 108 Lab.Cas. P 10,407
 Robert A. BACHE, Jr., et al., Plaintiffs-Appellants,
v.
AMERICAN TELEPHONE AND TELEGRAPH, etc., et al.,
Defendants-Appellees.
Jo B. BANKSTON, et al., Plaintiffs-Appellants,
v.
AMERICAN TELEPHONE AND TELEGRAPH CO., et al., Defendants-Appellees.
Carolyn CAREY, Plaintiff-Appellant,
v.
AMERICAN TELEPHONE AND TELEGRAPH INFORMATION SYSTEMS, INC.,
et al., Defendants- Appellees.
 Nos. 87-3007, 87-3327.
 United States Court of Appeals,
Fifth Circuit.
 March 23, 1988.
Rehearing Denied in No. 87-3007 May 11, 1988.
 
 Walter J. Leger, Jr., Franklin G. Shaw, New Orleans, La., for plaintiffs-appellants.
 Sylvan J. Steinberg, New Orleans, La., for Bankston, et al.
 T. George Delsa, New Orleans, La., for Carey.
 Robert K. McCalla, Keith M. Pyburn, Jr., McCalla, Thompson, Pyburn and Ridley, New Orleans, La., for American Tel. & Tel. Co.
 George W. Byrne, Jr., Wayne T. McGraw, Sutherland & Juge, New Orleans, La., for South Central Bell.
 John L. Quinn, Birmingham, Ala., Jerry L. Gardner, Jr., Louis L. Robein, Jr., Metairie, La., for Communications Workers of America.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before KING* and DAVIS, Circuit Judges, and FELDMAN**, District Judge.
 KING, Circuit Judge:
 
 
 1
 Plaintiffs appeal from adverse summary judgments in suits against their former employers for breach of a collective bargaining agreement and against the labor union for breach of the duty of fair representation. Because the plaintiffs failed to exhaust grievance procedures or to make a sufficient showing of unfair representation, the district court properly entered summary judgment against them, and thus we affirm.
 
 I.
 
 2
 This is a consolidated appeal of cases brought by former employees of South Central Bell Telephone Company ("SCB") and American Telephone and Telegraph Information Systems, Inc. ("ATTIS"), whose exclusive bargaining representative was Communication Workers of America, AFL-CIO ("CWA"). The suits, originally filed in state court, alleged breaches of contract and fraudulent misrepresentation by the former employers and the labor union in connection with employment layoffs during the fall of 1984 and the spring of 1986. The defendants asserted that section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. Sec. 185, governed the claims and removed the cases to the United States District Court for the Eastern District of Louisiana. The district court subsequently granted the defendants' motions for summary judgment, and the plaintiffs timely appealed from the final judgments dismissing their suits.
 
 
 3
 The relevant facts presented to the district court are as follows. On January 1, 1984, American Telephone and Telegraph Company ("AT & T") divested itself of the Bell Operating Companies, including SCB, pursuant to court order in federal antitrust litigation. See United States v. American Tel. & Tel. Co., 552 F.Supp. 131 (D.D.C.1982), aff'd, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). In preparing a plan of reorganization, AT & T negotiated with labor unions concerning the continued employment of union members, and on March 26, 1982, AT & T and CWA executed an Amended Memorandum of Agreement ("AMOA"). The AMOA provided, among other things, that the collective bargaining agreement in effect at SCB would continue to apply to employees who transferred from SCB to a new AT & T subsidiary or affiliate. The AMOA also contained provisions concerning the employment rights of transferred employees; these provisions became the subject of later dispute between ATTIS and CWA and established the basis for the present suits.
 
 
 4
 In the fall of 1983, all of the plaintiffs in these cases were SCB employees with substantial seniority, and on or about January 1, 1984, all transferred from SCB to ATTIS (then named American Bell Company). The plaintiffs state that they transferred because company and union representatives assured them of job security at ATTIS, because various informational materials represented that the AMOA guaranteed their continued employment for seven years after transfer, and because SCB told them that the type of work they were doing would be performed at ATTIS in the future. During the fall of 1984, however, ATTIS reduced its workforce and laid off or downgraded the plaintiffs from the first suit (Bache ). In response, CWA processed grievances on behalf of the Bache plaintiffs, which ATTIS denied, but did not proceed to arbitration. CWA states that it made this decision because it determined that the layoffs resulted from economic conditions and thus were contractually permissible.
 
 
 5
 In August of 1985, ATTIS announced a nationwide elimination of jobs affecting thousands of CWA-represented employees. In response, CWA filed an unfair labor practice charge against ATTIS with the National Labor Relations Board ("NLRB") on October 25, 1985. CWA complained that the 1985 layoffs resulted from divestiture-related reorganization and therefore violated the AMOA. To support its claim, CWA alleged that ATTIS' economic justification for the layoffs was pretextual because ATTIS was assigning overtime work to, and contracting out work of, targeted work groups in many locations. On January 29, 1986, the NLRB Regional Director rejected CWA's position that the AMOA imposed restrictions on ATTIS' ability to reduce its workforce and dismissed the charge. CWA appealed the adverse ruling to the NLRB, which affirmed the decision on April 21, 1986.
 
 
 6
 ATTIS laid off the plaintiffs from the second suit (Bankston ) in March 1986. No grievances were filed to protest these layoffs, but the Bankston plaintiffs contend that this omission resulted from CWA's refusal to represent them in the grievance process. The Bankston plaintiffs also assert that they have been denied preferential rehiring rights provided by the AMOA. They have not grieved these claims but similarly contend that CWA has refused to represent them in this regard.
 
 
 7
 On October 30, 1986, the district court entered summary judgment in Bache on the ground that there were no genuine issues of material fact concerning the plaintiffs' claims under section 301 of the LMRA.[1] Relying on Sturgeon v. Airborne Freight Corp., 778 F.2d 1154, 1158 (5th Cir.1985), the court held that to prevail against any of the defendants, the plaintiffs must prove that their discharges violated the labor contract and that the union breached its duty to represent them fairly. The court found that the terms of the applicable collective bargaining agreement and the AMOA permitted ATTIS to layoff and downgrade transferred employees and that, therefore, there was no breach of contract as a matter of law. The court also found that the plaintiffs offered no evidence that CWA acted in bad faith, with malice, or in a discriminatory manner when it determined that arbitration was unwarranted and thus they failed to demonstrate unfair representation. Accordingly, the court held that the plaintiffs were bound by the results of the grievance proceedings. In Bankston, the district court granted summary judgment on the basis of its previous decision in Bache.
 
 II.
 
 8
 On appeal, the plaintiffs contend that summary judgment was improper because factual disputes exist concerning (1) whether the AMOA guaranteed them seven years of employment, (2) whether the law required them to exhaust contractual remedies under the circumstances, and (3) if so, whether CWA's conduct excused their failure to complete the grievance process. The plaintiffs forcefully argue that facially inconsistent provisions of the AMOA--for example, one section stating that "no transferred employee shall be deprived of his or her employment" for a seven-year period following transfer and another providing that transferred employees laid off during the seven-year period have preferential rights of rehire--rendered the contract ambiguous and that extrinsic evidence they presented in response to the defendants' summary judgment motions created factual issues of contractual interpretation. They also urge us to consider whether an employer and union who make affirmative representations to employees concerning the contract's meaning should be estopped from later asserting another interpretation. We conclude, however, that we need not reach these issues because the plaintiffs' failure to establish an essential element of their claims--that the union breached its duty of fair representation--is dispositive of this appeal.
 
 
 9
 Under the Federal Rules of Civil Procedure, summary judgment is proper if, when viewing the evidence most favorably to the nonmoving party, "the pleadings [and other documentary evidence on file] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). See Russell v. Harrison, 736 F.2d 283, 287 (5th Cir.1984). In reviewing a summary judgment, we apply the same standard that governs the district court's determination. Russell, 736 F.2d at 287. Recent Supreme Court pronouncements also guide our inquiry:
 
 
 10
 In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.
 
 
 11
 Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). Thus to determine which factual issues are material, we must first examine the substantive law that governs the case, and to determine if an issue of material fact is genuine, we must then decide whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).
 
 
 12
 Section 301 of the LMRA provides an individual employee with a federal cause of action against his employer for breach of a collective bargaining agreement. Smith v. Evening News Assoc., 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); see 29 U.S.C. Sec. 185(a). An employee's cause of action against the union for breach of the duty of fair representation is implied from the statutory scheme of federal labor law. Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Because of the intricate relationship between the duty of fair representation and the enforcement of a collectively bargained contract, the two causes of action have become "inextricably interdependent" and known as a "hybrid Sec. 301/fair representation" suit. DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 164-65, 103 S.Ct. 2281, 2290-91, 76 L.Ed.2d 476 (1983).
 
 
 13
 The interdependency arises from the nature of the collective bargaining agreement. If the arbitration and grievance procedure is the exclusive and final remedy for breach of the collective bargaining agreement, the employee may not sue his employer under Sec. 301 until he has exhausted the procedure. Further, he is bound by the procedure's result unless he proves the union breached its duty of fair representation.
 
 
 14
 Daigle v. Gulf State Util. Co., 794 F.2d 974, 977 (5th Cir.1986) (citations omitted). The general rule of exhaustion is inapplicable, however, "if the parties to the collective bargaining agreement expressly agreed that arbitration was not the exclusive remedy" for the breach of contract claims at issue. Republic Steel Corp. v. Maddox, 379 U.S. 650, 657-58, 85 S.Ct. 614, 619, 13 L.Ed.2d 580 (1965); see Daigle, 794 F.2d at 977. Moreover, the Supreme Court has recognized other exceptions. See, e.g., Vaca, 386 U.S. at 185, 87 S.Ct. at 914. We have summarized them as follows:
 
 
 15
 No exhaustion is necessary if: (1) the union wrongfully refuses to process the employee's grievance, thus violating its duty of fair representation; (2) the employer's conduct amounts to a repudiation of the remedial procedures specified in the contract; or (3) exhaustion of contractual remedies would be futile because the aggrieved employee would have to submit his claim to a group "which is in large part chosen by the [employer and union] against whom [his] real complaint is made."
 
 
 16
 Rabalais v. Dresser Indus., Inc., 566 F.2d 518, 519 (5th Cir.1978) (citations omitted).
 
 
 17
 In this case, it is undisputed that the collective bargaining agreement governing the plaintiffs' employment contained mandatory grievance and arbitration procedures and that none of the plaintiffs exhausted this contractual remedy. However, the plaintiffs contend that three of the above exceptions relieve them of the exhaustion requirement.[2] First, the plaintiffs argue that the collective bargaining agreement's grievance and arbitration procedures do not apply to disputes concerning the AMOA. They premise their argument on an assertion that the AMOA is itself a collectively bargained agreement that contains no remedial provisions. We find this argument specious because the collective bargaining agreement specifically provided for partial amendments and supplemental agreements by mutual consent and, more importantly, the arbitration provision covered disputes "regarding the true intent and meaning of any provisions of this or any other agreement between the parties." Agreement between Communication Workers of America and South Central Bell Telephone Company effective August 7, 1983, article 23.01(B) (emphasis added). Moreover, the Bache plaintiffs utilized the grievance procedures to remedy their AMOA-related claims, and there is no indication that ATTIS denied the grievances or that CWA decided not to seek arbitration because the procedures were inapplicable.
 
 
 18
 The fact that ATTIS actually processed the Bache plaintiffs' grievances also undermines the second argument--that ATTIS repudiated the contract's remedial procedures. The plaintiffs point to evidence that in an unrelated arbitration proceeding in October 1985, a representative of ATTIS stated that disputes arising under the AMOA were not subject to resolution through grievance and arbitration procedures because the AMOA did not so provide. This, they argue, constituted a repudiation by ATTIS. We disagree. We have previously stated: "An employer can obviously take a stance contrary to that of the employee during the grievance process without being deemed to have repudiated that process." Rabalais, 566 F.2d at 520.
 
 
 19
 As we explained above, the remaining exception--a breach of the union's duty of fair representation--both excuses a failure to exhaust the contractual remedies and removes the bar of the finality provisions of the contract. See also Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 567, 96 S.Ct. 1048, 1057-58, 47 L.Ed.2d 231 (1976). Thus viewed either way, a breach of CWA's duty of fair representation is an essential element of the plaintiffs' case. The plaintiffs contend that they presented sufficient evidence of CWA's bad faith and arbitrary and discriminatory conduct to create a factual dispute concerning this element and therefore preclude summary judgment. After carefully reviewing the record in each case, we cannot agree.
 
 
 20
 Because the collective bargaining system "of necessity subordinates the interests of an individual employee to the collective interests of all employees in a bargaining unit," the duty of fair representation stands "as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." Vaca, 386 U.S. at 182, 87 S.Ct. at 912. The doctrine imposes an obligation on the exclusive bargaining representative "to serve the interests of all members [of a designated bargaining unit] without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." Id. at 177, 87 S.Ct. at 910. We recently observed:
 
 
 21
 The standards for determining what constitutes the union's duty of fair representation have not yet been fully defined, but that duty clearly includes the obligation to enforce collective bargaining agreements and to prosecute members' grievances arising under them nonarbitrarily and in good faith.... [However,] fair representation does not require a union to carry every grievance to arbitration, for the union is given substantial discretion to decide whether and how far a grievance should be pursued.
 
 
 22
 Hammons v. Adams, 783 F.2d 597, 601 (5th Cir.1986) (citations omitted). In Hammons, we held that the legal duty to process a grievance "rests on the union, which must prosecute a grievance or refuse for adequate reason to do so." Id. at 602. We did not there decide what would constitute an adequate reason but merely stated that the union had the duty to prosecute the employees' grievances "with reasonable diligence unless it decided in good faith that the grievances lacked merit or for some other reason should not be pursued." Id.
 
 
 23
 In this case, the plaintiffs contend that the totality of the evidence shows a pattern of conduct by CWA that raises an inference of bad faith. In particular, they assert that CWA participated in, or failed to prevent their employers from, misrepresenting the AMOA's meaning and fraudulently inducing their transfers. The Bache plaintiffs also argue that their layoffs alerted CWA to a difference in ATTIS' interpretation of the AMOA but that CWA refused to pursue arbitration of their grievances or to take any action to resolve the problem until 1985 when it filed the NLRB complaint. Furthermore, the Bache plaintiffs allege that instead of arbitrating their claims, CWA's attorney counselled them to file a state court action. In support, they produced a copy of a letter from an attorney advising them to seek counsel for filing a suit. This evidence, they argue, shows both that CWA arbitrarily abandoned their cause and that CWA discriminated against them. The Bankston plaintiffs argue that their affidavits stating that CWA ignored their requests to file grievances on their behalf shows CWA's arbitrary and discriminatory conduct.
 
 
 24
 CWA denies, however, that it represented to employees that the AMOA provided an absolute guarantee of employment for seven years following transfer. CWA maintains that it understood the AMOA to prohibit divestiture-related layoffs but to permit terminations for economic and disciplinary reasons and that its communications to local unions and employees were consistent with its interpretation. Furthermore, CWA explains its responses to the plaintiffs' grievances: first, it determined that economic factors motivated the 1984 layoffs, and second, it decided for tactical reasons to remedy the substantial number of divestiture-related layoffs that began in 1985 through NLRB action rather than the grievance process. An affidavit by CWA Vice President Robert Allen details the union's investigative activities concerning the layoffs and its decision to institute NLRB proceedings. CWA also points out that the plaintiffs' evidence failed to connect the national union to the alleged misrepresentations and that the attorney who advised the Bache plaintiffs concerning a judicial remedy for their claims represented the local union, not CWA.[3]
 
 
 25
 CWA's arguments are well-founded. The only evidence offered by the plaintiffs to support the allegations of misrepresentation by CWA was (1) a two-page letter by Executive Vice President John Carroll informing local presidents of the AMOA, to which he attached the full text of the agreement, and (2) a CWA newsletter outlining the terms of the AMOA, which specifically stated, "it insures that the Bell System workers we represent won't suffer loss of wages ... as a result of reorganization," and referred to the possibility of layoffs during the seven-year period. Instead, the plaintiffs rely on evidence that workers throughout the nation believed that a seven-year guarantee of employment existed to create an inference of national union involvement. In view of the plaintiffs' allegations that SCB and ATTIS were actively making the misrepresentations and falsely inducing the transfers, we do not believe that such an inference arises, and without any evidence that CWA knew of the misrepresentations at the time they were allegedly made, we fail to see how CWA's duty of fair representation encompasses a duty to prevent them.
 
 
 26
 Because the plaintiffs made an insufficient showing of CWA's bad faith based on its alleged participation in misrepresenting the employment guarantee, we are left with claims that CWA arbitrarily refused to pursue meritorious grievances. However, "a breach of the duty of fair representation is not established merely by proof that the underlying grievance was meritorious." Vaca, 386 U.S. at 195, 87 S.Ct. at 919. A union breaches its duty when it arbitrarily ignores a meritorious grievance or processes it in a perfunctory manner. Id. at 191, 87 S.Ct. at 917. The Bache plaintiffs offered no evidence that CWA failed to adequately investigate their grievances before deciding that arbitration was unwarranted. Rather, the Bache plaintiffs' position is essentially that CWA had a duty to pursue arbitration based on their interpretation of the contract--that it absolutely guaranteed their employment for seven years.
 
 
 27
 In our view, however, the union's authority as a collective bargaining representative necessarily empowers it to act according to its own reasonable interpretation of the labor contract. Federal labor law promotes arbitration and private dispute resolution because they are extensions of the bargaining process: "The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement." Steelworkers v. Warrior & Gulf Co., 363 U.S. 574, 581, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). To require the union to advocate an individual employee's view of the labor contract under the guise of "fair representation" would undermine the union's role as the representative of the collective interest. The Supreme Court has stated the standard by which courts must measure a union's conduct, both during the bargaining process and the adjustment of grievances: " 'A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.' " Humphrey v. Moore, 375 U.S. 335, 349, 84 S.Ct. 363, 372, 11 L.Ed.2d 370 (1964) (quoting Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953)).
 
 
 28
 In Turner v. Air Transport Dispatchers' Assoc., 468 F.2d 297 (5th Cir.1972), we affirmed a summary judgment against an employee who alleged that the union breached its duty of fair representation because it refused to process a grievance which was contrary to its interpretation of the collective bargaining agreement. We concluded that the union fulfilled its duty by listening to the employee's arguments at an open meeting and informing him of the union's position: "Further union investigation was unnecessary since the only difference between [the employee], on one side, and [the employer and union], on the other, concerned the interpretation of the collective bargaining agreement, and not a dispute over facts." Id. at 300. In Turner, however, the court observed that the union's interpretation "was the only plausible one under the explicit language of the collective bargaining agreement," id., and thus the reasonableness of the union's conduct did not hinge on the merits of its interpretation. One could argue that if a contract is ambiguous and an employee's interpretation is a reasonable one, the circumstances are distinguishable. Prior decisions of this court provide a response to that argument.
 
 
 29
 In Tedford v. Peabody Coal Co., 533 F.2d 952, 957 (5th Cir.1976), we held that the relevant question in deciding a similar fair representation issue was not whether the union's interpretation was correct but whether it was nonarbitrary. We stated: "The essence of this action lies not in the [employee's] interpretation deemed reasonable by the district court, but in the reasonableness of the [union's] interpretation." Id. at 957. In Tedford, an employee took a leave of absence based on one interpretation of a contractual clause, and the union, which changed its position during his absence, refused, based on its subsequent interpretation, to arbitrate the employee's grievance seeking reinstatement. We rejected the district court's finding that " 'a reversal of interpretation or custom which is to have retroactive effect amounts in itself to arbitrary conduct,' " stating that "[i]f the foregoing rule is sustained, the duty of fair representation will be extended so as to protect the interest of the individual employee without regard to the group interests." Id. at 956. Instead, we defined the arbitrariness standard by reference to "relevant, permissible union factors," rationality of result, and "fair and impartial consideration of the interests of all employees." Id. at 957. Applying this standard, we concluded that neither the union's interpretation nor the decision to apply it retroactively breached the duty of fair representation.
 
 
 30
 We considered a similar issue in Sanderson v. Ford Motor Co., 483 F.2d 102 (5th Cir.1973). In Sanderson, a union and employer resolved conflicting contractual provisions concerning seniority, and the union subsequently refused to process the grievances of an employee who was adversely affected by the agreed interpretation. We rejected the proposition that the union breached its duty of fair representation by agreeing to a settlement that clearly contravened a provision of the collective bargaining agreement. Instead, we observed that the terms of a collective agreement consist of not only its written provisions but oral and written amendments, the conduct of the parties, the industrial common law, and the results of the interpretive process. We held that "the district court could not properly conclude as a matter of law that the settlement agreed to by the Union clearly exceeded the bounds of fair interpretation of the collective contract." Id. at 113. Accordingly, we remanded the case for a trial of the fair representation issue, which involved allegations that the union fraudulently induced the employee to consent to a settlement agreement.
 
 
 31
 From these cases, we conclude that a union does not breach its duty of fair representation by rejecting an employee's interpretation of the collective bargaining agreement unless the union's interpretation is itself arbitrary or unreasonable. In this case, we cannot say that CWA's interpretation of the AMOA was "clearly beyond the bounds of reasonable interpretation." Id. at 112. Nor do the plaintiffs assert that CWA's interpretation was unrelated to the interests of all represented employees or based on impermissible factors, such as "personal animosity or political favoritism." Tedford, 533 F.2d at 957. In short, CWA's decision not to invoke arbitration after evaluating the merits of the Bache plaintiffs' grievances according to its interpretation of the AMOA constituted a permissible exercise of its discretion. Thus absent evidence that CWA arbitrarily abandoned their grievances, the Bache plaintiffs failed to raise a factual dispute concerning the breach of CWA's duty of fair representation.[4]
 
 
 32
 Similarly, the Bankston plaintiffs offered insufficient evidence to show that CWA arbitrarily refused to process their grievances. CWA decided to seek relief from the NLRB concerning the scheduled layoffs that ATTIS announced in 1985, and its complaint to the NLRB included the same allegations that the plaintiffs sought to assert. At the time that the Bankston plaintiffs' grievances arose, the NLRB Regional Director had already rejected CWA's interpretation of the AMOA, and unless CWA pursued a remedy in that forum, arbitration of similar grievances appeared futile. We held in Stanley v. General Foods Corp., 508 F.2d 274, 275 (5th Cir.1975), that a union did not breach its duty of fair representation by failing to pursue a grievance that challenged a factory rule after that rule was upheld in another case. In other words, a union's assessment of the merits of a grievance may include a determination of whether the underlying theory continues to be valid.
 
 
 33
 In essence, the Bankston plaintiffs assert that choosing the NLRB remedial process rather than the contractual one was itself arbitrary. In Kaylor v. Crown Zellerbach, Inc., 643 F.2d 1362, 1369 (9th Cir.1981), the Ninth Circuit held that a union did not breach its duty of fair representation by seeking relief from the NLRB rather than through arbitration under the circumstances of that case. In Kaylor, the union made a tactical decision to resort to the NLRB because its attorney believed that the legal theory involved was more likely to succeed before the NLRB than a grievance committee. The court affirmed a summary judgment for the union because "uncontroverted facts show this decision to be a reasonable one." Id. In this case, the plaintiffs offered no evidence to show that CWA's decision was unreasonable.
 
 
 34
 Concerning their preferential rehiring claims, the Bankston plaintiffs failed to produce evidence, except by vague affidavits with identical, conclusory statements, that they have presented these grievances to CWA seeking its representation. The affidavits stated simply "that CWA refuses to entertain, file and/or recognize and CWA refuses to proceed with any grievance procedures against defendants in regard [to re-employment rights]." CWA denied this allegation, and under Celotex, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits ... designate 'specific facts.' " 106 S.Ct. 2553. Of course, the Court in Celotex cautioned that the nonmoving party must have adequate time for discovery, but the Court also stated that problems with premature motions could "be adequately dealt with under Rule 56(f), which allows a summary judgment motion to be denied, or the hearing on the motion to be continued." Id. at 2554-55. Under Rule 56(f), a party opposing the motion may show by affidavit "that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition." Fed.R.Civ.P. 56(f). The Bankston plaintiffs submitted no Rule 56(f) affidavits, and we cannot see how lack of discovery prevented them from stating in their filed affidavits specific facts to support their allegations, such as a date that they informed CWA of their grievances. Thus we conclude that the plaintiffs made an insufficient showing of CWA's arbitrariness to preclude summary judgment on this issue.
 
 III.
 
 35
 For the above reasons, the judgment is AFFIRMED.
 
 
 
 *
 formerly Carolyn Dineen Randall
 
 
 **
 District Judge of the Eastern District of Louisiana, sitting by designation
 
 
 [1]
 The district court held that section 301 preempted the plaintiffs' state law claims because resolution of them depended on an analysis of a collective bargaining agreement. See Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220, 105 S.Ct. 1904, 1916, 85 L.Ed.2d 206 (1985). On appeal, the Bankston plaintiffs challenge this ruling. Specifically, they contend that a Louisiana statute that penalizes employers for breaching term employment contracts should not be preempted because employees covered by labor contracts would thus be deprived of a penal remedy available to other workers in the state. See La.Civ.Code Ann. art. 2749 (West 1952). They argue that while the terms of their employment contracts must be determined according to federal law, their state law claims should still exist once a breach of contract is established. We find this argument meritless because the analysis suggested by the Bankston plaintiffs is unsupported by law
 In the recent case of International Brotherhood of Electrical Workers v. Hechler, --- U.S. ----, 107 S.Ct. 2161, 95 L.Ed.2d 791 (1987), the Supreme Court restated the holding of its earlier decision in Allis-Chalmers: "The rule there set forth is that, when a state-law claim is substantially dependent on analysis of a collective-bargaining agreement, a plaintiff may not evade the pre-emptive force of Sec. 301 of the LMRA by casting the suit as a state-law claim." Id. 107 S.Ct. at 2166 n. 3. The Court further explained that the rule extends beyond breach of contract suits to encompass other employment claims of union-represented employees unless state laws "proscribe conduct, or establish rights and obligations, independent of labor contracts." Id. (quoting Allis-Chalmers, 471 U.S. at 212, 105 S.Ct. at 1912). The Court has not indicated, however, that an employee's contractual claim may be divided into federal and state components in order to preserve a remedy unavailable under section 301. To the contrary, federal law is "paramount in 'the area covered by' Sec. 301." Id. 107 S.Ct. at 2165 (quoting Teamsters v. Lucas Flour Co., 369 U.S. 95, 103, 82 S.Ct. 571, 576-77, 7 L.Ed.2d 593 (1962)).
 To the extent that the plaintiffs assert that the AMOA is separable from the collective bargaining agreement and thus that their AMOA-based claims do not require interpretation of the agreement itself, their argument is foreclosed by our decision in Eitmann v. New Orleans Pub. Serv., Inc., 730 F.2d 359, 362-63 (5th Cir.1984). In Eitmann, we held that section 301 preempted the state-law contractual claim of an employee covered by a collective bargaining agreement who asserted an individual employment contract that limited or conditioned the terms of the collective agreement. Here, the plaintiffs contend that the employer lost its right under the collective bargaining agreement to layoff transferred employees by the terms of the AMOA or, alternatively, under promissory estoppel principles. Clearly then, the plaintiffs seek to assert a contract that limits or conditions the terms of the collective agreement, and federal law must govern their claims. Furthermore, to the extent that the Bankston plaintiffs urge us, on oral argument, to consider an additional theory--that they alleged a state-tort action that should not be preempted--we believe the result is unchanged because Allis-Chalmers and Hechler are controlling. Claims of wrongful termination based on fraudulent or other tortious conduct by the employers and union would still involve
 questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, [and] must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort. Any other result would elevate form over substance and allow parties to evade the requirements of Sec. 301 by re-labeling their contract claims as claims for tortious breach of contract.
 Allis-Chalmers, 471 U.S. at 211, 105 S.Ct. at 1911. See Mason v. Continental Group, Inc., 763 F.2d 1219, 1224 (11th Cir.1985); Redmond v. Dresser Indus., Inc., 734 F.2d 633, 635 (11th Cir.1984).
 
 
 [2]
 The Bankston plaintiffs also assert that the fourth exception--lack of an impartial decision-maker--is applicable. They do not explain, however, how this exception applies to their case. Presumably, their argument is that the union's alleged participation in misrepresenting the terms of the AMOA tainted the contract's remedial procedures, which allowed the union and employer to jointly select an arbitrator. Because we consider the allegations of union misconduct below in discussing the breach-of-duty exception, we need not address this argument separately
 
 
 [3]
 Common-law agency principles govern the determination of whether a national union may be legally responsible for the unilateral actions of local unions or their agents. See Carbon Fuel Co. v. United Mine Workers, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979)
 
 
 [4]
 Although the Bache plaintiffs also argue that CWA discriminated against them by responding to later layoffs differently, they did not substantiate these allegations. The groups of employees whose grievances CWA treated differently were laid off at different times and under different conditions, and the plaintiffs made no attempt to show that the groups were similarly situated