Melvin LANDRY, Plaintiff–Appellant,

v.

THE COOPER/T. SMITH STEVEDORING COMPANY, INC., et al., Defendants–Appellees.

No. 88–3388.

United States Court of Appeals, Fifth Circuit.

Aug. 22, 1989.

Lyman L. Jones, Jr., New Orleans, La., for plaintiff-appellant.

David E. Walker, Walker, Bordelon, Hamlin & Theriot, New Orleans, La., for Cooper/T. Smith, etc.

David H. Seelig, Seelig, Cosse, Frischhertz & Poulliard, New Orleans, La., for The Dock Loaders & Freight Cars & Barge.

Before THORNBERRY, WILLIAMS and DAVIS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Melvin Landry appeals a judgment notwithstanding the verdict in favor of his employer and his union. In the court below, Landry contended that his employer had violated the terms of the collective

bargaining agreement by revoking his registration card, and that the union had breached its duty of fair representation in prosecuting his grievances. After a jury verdict in favor of Landry on both claims, the district court entered judgment for the defendants. We affirm the judgment notwithstanding the verdict on the ground that Landry failed to introduce sufficient evidence to support a finding that the union's representation in his grievance was not fair, which is a prerequisite for recovery against both the employer and the union.

## I. *Background*

### A. *Contractual Relationship Between the Parties*

Melvin Landry, a freight handler in the Port of New Orleans, is a member of appellee Dock Loaders and Unloaders of Freight Cars and Barges, Local Union 854 of the International Longshoremen's Association, AFL–CIO ("Local 854" or "the union"). Appellee Cooper/T. Smith Stevedoring Company ("Cooper/Smith") operates in the Port of New Orleans, hiring members of the union to load and unload freight. Cooper/Smith is a member of appellee New Orleans Steamship Association ("NOSSA"), a trade group of companies doing business in the port. NOSSA is the bargaining agent for shipping and stevedoring companies in the port. At the time of the incidents giving rise to this lawsuit, the terms and conditions of freight handlers' employment with the New Orleans stevedoring companies was governed by the 1983–1986 Deep–Sea Agreement, a collective bargaining agreement between Local 854 and NOSSA.

Under the agreement, freight handlers who worked a certain number of hours during a qualifying year received a registration card (also known as a "G" card) that entitled them to a hiring preference at the Waterfront Employment Center, where the freight handlers would appear for morning "shape-up" to be hired for the day by stevedoring companies. Employees eligible for a registration card also participated in a Guaranteed Annual Income Plan, which provided partial compensation to freight handlers when work was not available. Melvin Landry possessed a "G" card. Under the collective bargaining agreement, a registration card could be revoked by NOSSA for "just cause." [1]

The collective bargaining agreement contained grievance procedures that provided the exclusive mechanism to settle employment disputes between union members and the stevedoring companies. At each step in the process, the complaining freight handler was represented by the union. The first step involved an immediate discussion between a representative of the employer and of the union. If a satisfactory settlement was not reached, either side could refer the matter to the Permanent Disputes Committee, consisting of two representatives of NOSSA and two Local 854 officials. Under Step Two of the grievance procedures, the Permanent Disputes Committee conducted a hearing. If the dispute was not resolved at this level, the employer or the union could refer the grievance to binding arbitration by an independent arbitrator, which was the third and final step in the grievance process.

### B. *Landry's Disciplinary Citations*

On several occasions, Melvin Landry was cited for contract violations while in the employ of Cooper/Smith. In May, 1978, Landry was involved in a physical altercation with a Cooper/Smith foreman. After a Step Two Permanent Disputes Committee hearing, Landry's registration card was suspended for sixty days.

In January and April, 1983, Landry and approximately twenty-five other workers were cited for "poor production" by Cooper/Smith. These citations were part of a larger controversy surrounding an attempt

---

**1.** As is the usual circumstance in collective bargaining agreements, the contract did not define "just cause." A NOSSA official testified that the Association followed a typical policy of progressive discipline, attempting to impose a punishment that was consistent with the severity of the offense. NOSSA would impose a more serious punishment when a worker had accumulated several disciplinary citations.

by NOSSA and its members to increase the production of the freight handlers in the Port of New Orleans. Local 854 filed a grievance on behalf of its members who were cited. The grievance progressed to arbitration before an independent arbitrator in June, 1983. That arbitration was adjourned on its first day because the arbitrator was called away on a family emergency. The union did not attempt to reschedule the arbitration, despite demands from some of its members, including Landry. Thus, the poor production citations remained on Landry's employment record. In a letter accompanying the citations, Landry was informed that any future contract violations would result in further disciplinary action, which could include permanent revocation of his registration card.

In January, 1985, Landry was again cited for a violation of the labor contract by a Cooper/Smith supervisor. This incident involved the refusal of Landry and one other worker to work on a rainy day.[2] Twenty-three other union members on the same work crew went to work without protest. A union vice-president on the scene attempted to settle the dispute through a Step One discussion with the Cooper/Smith supervisor. The union representative, Ray Worthy, proposed that two other men work in place of Landry and the second protesting employee, with the understanding that Landry and his co-worker would not be disciplined and would not seek any pay for that day. Although Worthy and Landry left the scene thinking that a settlement had been reached, Landry was later cited for the incident.

On February 18, 1985, Landry and the union were notified that Landry's registration card would be picked up because he had accumulated three contract violations. Local 854 grieved this action on behalf of Landry before the Permanent Disputes Committee at a Step Two proceeding. The Committee met twice, with Landry present, to discuss the matter, but deadlocked in its vote. Landry turned in his card at the second meeting.[3]

Local 854 did not request arbitration to regain Landry's "G" card. Instead, the union president, Tyrone Webster, persistently lobbied NOSSA officials informally, asking them to return the card so that Landry would be allowed to work and support his family. On May 15, 1985, the Permanent Disputes Committee met and agreed to reduce the revocation to a 72–day suspension, which would allow Landry to pick up his card immediately and return to work. Landry was present at the meeting.

Two days later, Landry, accompanied by Tyrone Webster, picked up his registration card at the Waterfront Employment Center. Landry was told he needed to sign an agreement in order to regain his card. After reading the settlement agreement, Landry signed the document. The agreement stated that as a settlement of Landry's prior grievances, the revocation of Landry's card was reduced to a 72–day suspension. Landry was able to return to work as of May 15, 1985.

## C. Prior Proceedings

In August, 1985, Landry filed complaint against Cooper/Smith, NOSSA, and Local 854. Landry alleged that Cooper/Smith and NOSSA had wrongfully revoked his registration card under the collective bargaining agreement. Landry also contended that the union had violated its duty of

---

**2.** The collective bargaining agreement contained a rain clause, which allowed an employer to work men in the rain if the workers were either suitably sheltered or furnished with rain gear. There was conflicting testimony at trial as to whether appropriate protection was offered when Landry refused to work. The rain clause also specified that if freight handlers were prevented from working by rain, they were entitled to a minimum of two hours' pay for the day.

**3.** Landry testified at trial that he believed when he turned in his card that his working privileges were being temporarily suspended. Other parties present at the meeting testified that this action was in fact a permanent revocation of Landry's card. A settlement agreement later signed by Landry also indicated that his registration card had been permanently revoked.

On appeal, Landry does not contend that the original action was intended only as a suspension of his card. Instead, his brief characterizes this step as a revocation.

fair representation in processing his grievances.

The case proceeded to a jury trial in March, 1988. The district court reserved a ruling on the defendants' motions for a directed verdict. The jury returned a verdict in favor of Landry, finding that Landry's registration card had been wrongfully revoked and that Local 854 had breached its duty of fair representation. The jury also rejected as a defense that Landry had signed a binding settlement agreement. The jury awarded $27,500 in damages, which was apportioned 45 percent to Cooper/Smith, 45 percent to NOSSA, and 10 percent to Local 854.

The district court then granted the defendants' motion for judgment notwithstanding the verdict (JNOV), and entered a judgment in favor of Cooper/Smith, NOSSA, and Local 854. The court determined that the great weight of the evidence established that Landry's acceptance of the written agreement was a final settlement of his claim that the revocation of his registration card was in violation of the labor contract. The court also concluded that the union had fulfilled its duty to represent Landry fairly in the grievance proceedings. Landry appeals.

## II. *Standard of Review*

■ A judgment notwithstanding the verdict is proper

> only when the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable [people] could not arrive at a contrary verdict, viewing the facts in the light most favorable to the party against whom the motion is made, and giving that party the advantage of every fair and reasonable inference which the evidence justifies.

*Harwood and Assoc., Inc. v. Texas Bank and Trust*, 654 F.2d 1073, 1076 (5th Cir. Unit A, Sept. 1981) (citing *Boeing v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969) (en banc)). There must be a "conflict in substantial evidence," however, to create a jury question; a mere scintilla of proof is insufficient. *Boeing*, 411 F.2d at 375. We apply the same standard to review a JNOV on appeal. *Dawsey v. Olin Corp.*, 782 F.2d 1254, 1261 (5th Cir.1986).

## III. *Landry's Interrelated Claims*

A. The *"Hybrid § 301/Fair Representation Claim"*[4]

Federal jurisdiction over Landry's claims arises from two different sources. Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, provides an employee with a federal cause of action against his employer for breach of a collective bargaining agreement. *See. Smith v. Evening News Assoc.*, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). An employee's cause of action against his union for breach of the duty of fair representation is implied by the courts from the statutory scheme of federal labor law. *See Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

These two separate causes of action, however, are "inextricably interdependent." *Del Costello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 164–65, 103 S.Ct. 2281, 2290–91, 76 L.Ed.2d 476 (1983).

> The interdependency arises from the nature of the collective bargaining agreement. If the arbitration and grievance procedure is the exclusive and final remedy for breach of the collective bargaining agreement, the employee may not sue his employer under § 301 until he has exhausted the procedure. Further, he is bound by the procedure's result *unless* he proves the union breached its duty of fair representation.

*Daigle v. Gulf State Utility Co.*, 794 F.2d 974, 977 (5th Cir.), *cert. denied*, 479 U.S. 1008, 107 S.Ct. 648, 93 L.Ed.2d 704 (1986) (citations omitted) (emphasis added).

A breach by a union of its duty of fair representation, then, provides an exception to the general rule that courts will not entertain challenges to an arbitral decision

---

**4.** *DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 165, 103 S.Ct. 2281, 2291, 76 L.Ed. 2d 476 (1983).

or a grievance settlement when the collective bargaining agreement specifies that such a resolution is final. *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 567, 96 S.Ct. 1048, 1058, 47 L.Ed.2d 231 (1976); *Bache v. American Telephone and Telegraph*, 840 F.2d 283, 289 (5th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 219, 102 L.Ed.2d 210 (1988). The hybrid § 301/fair representation suit "amount[s] to a direct challenge to the private settlement of disputes under the collective bargaining agreement." *DelCostello*, 462 U.S. at 165, 103 S.Ct. at 2291 (quoting *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 66, 101 S.Ct. 1559, 1566, 67 L.Ed.2d 732 (1981) (Stewart, J., concurring in judgment)). To overcome the bar of finality, however, an employee must establish that his union's breach of its duty of fair representation "seriously undermine[d] the integrity of the [grievance] process." *Hines*, 424 U.S. at 567, 96 S.Ct. at 1058. *See also United Parcel Service*, 451 U.S. at 61, 101 S.Ct. at 1563.

B. *Finality of the Separate Signed Agreement*

The settlement of Landry's grievance, which allowed him to regain his registration card after a 72–day suspension, resulted from negotiations at a Step Two grievance proceeding pursuant to the collective bargaining agreement. The grievance settlement was embodied, however, in a discrete written agreement signed by Landry. Cooper/Smith and NOSSA suggest that this separate agreement is absolutely final without regard to whether Local 854 breached its duty of fair representation, because Landry expressly agreed to accept the return of his "G" card as a settlement of his prior grievances. In effect, they argue for an exception to the rule that a union's breach of the duty of fair representation may open a final grievance settlement, which would apply when the grievant specifically consents to the settlement.

The parties and the court below focused much of their attention on the finality of the signed settlement agreement. We do not need to reach this question, however, to decide Landry's appeal.[5] Instead, we conclude that the question of whether Local 854 breached its duty of fair representation is the controlling issue.

The settlement agreement states only that it resolves Landry's grievances against Cooper/Smith and NOSSA. It does not purport to settle Landry's duty of fair representation claim against Local 854, which had not even been raised at the time the agreement was signed. Accordingly, even assuming that the agreement cannot be challenged, it would resolve only one prong of Landry's interrelated claims. We would then have to address Landry's contention that the union breached its duty of fair representation.

■ This two-step analysis becomes unnecessary, however, if we determine as an initial matter that Local 854 did not breach its duty to represent Landry fairly. Landry must establish this breach to prevail against the union *and* his employer; "the 'indispensable predicate' for a § 301 action in this situation is a fair representation claim against the union." *Daigle*, 794 F.2d at 977 (quoting *United Parcel Service*, 451 U.S. at 62, 101 S.Ct. at 1564). *See also Hines*, 424 U.S. at 567, 96 S.Ct. at 1058; *Bache*, 840 F.2d at 289. If Landry did not introduce sufficient evidence to establish the union's breach, the JNOV was proper for both of his claims. Accordingly, without deciding the independent finality of the signed settlement agreement, we turn to the dispositive question of whether Local 854 breached its duty of fair representation.

---

**5.** We note some authority contrary to the argument advanced by Cooper/Smith and NOSSA. In *Sanderson v. Ford Motor Co.,* 483 F.2d 102 (5th Cir.1973), this Court determined that a settlement agreement signed by the complaining employee could be subject to challenge if the union breached its duty of fair representation in negotiating the settlement. We concluded that the question of the employee's consent to the negotiated settlement "did not belong in the case as a determinative issue." 483 F.2d at 114.

## IV. The Union's Duty of Fair Representation

### A. Scope of the Duty

A union must represent all employees fairly in its enforcement of a collective bargaining agreement. This duty of fair representation stands "as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." *Vaca*, 386 U.S. at 182, 87 S.Ct. at 912.

A union retains considerable discretion, however, in processing the grievances of its members. *Cox v. C.H. Masland & Sons*, 607 F.2d 138, 142 (5th Cir. 1979); *Turner v. Air Transport Dispatchers Assoc.*, 468 F.2d 297, 299 (5th Cir.1972). An employee has no absolute right to have his grievance taken to arbitration, *Vaca*, 386 U.S. at 191, 87 S.Ct. at 917, or to any other level of the grievance process. *Turner*, 468 F.2d at 300. Instead, a breach of the duty of fair representation occurs "only when the union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190, 87 S.Ct. at 916.

Under this test, a union may not "arbitrarily ignore a meritorious grievance or process it in perfunctory fashion." *Id.* at 191, 87 S.Ct. at 917. Thus, the duty of fair representation imposes an obligation for a union to investigate a grievance in good faith. *Abilene Sheet Metal, Inc. v. NLRB*, 619 F.2d 332, 347 (5th Cir.1980). A union also has an obligation to prosecute a grievance "with reasonable diligence unless it decided in good faith that the grievance lacked merit or for some other reason should not be pursued." *Hammons v. Adams*, 783 F.2d 597, 602 (5th Cir.1986).

A union does not breach its duty of fair representation, however, through simple negligence or a mistake in judgment. *See Vaca*, 386 U.S. at 192–93, 87 S.Ct. at 918; *Connally v. Transcon Lines*, 583 F.2d 199, 203 (5th Cir.1978). We have upheld a determination that a union did not breach its duty when its conduct in processing an employee's grievance was "less than enthusiastic" and "not perfect." *Connally*, 583 F.2d at 202–203. The critical question is whether a union's conduct was arbitrary, discriminatory, or in bad faith, so that it undermined the fairness or integrity of the grievance process. *See Hines*, 424 U.S. at 567–69, 96 S.Ct. at 1058.

### B. Local 854's Actions Prosecuting Landry's Grievances

The revocation of Landry's registration card resulted from his accumulation of three disciplinary citations. Two citations arose from the 1983 dispute over production quotas, and were grieved together. The third incident, which immediately preceded the revocation of Landry's registration card, involved Landry's 1985 refusal to work in the rain.

We have carefully reviewed the evidence of the union's conduct in both 1983 and 1985. While mindful of the deferential standard of review due the jury's verdict, we conclude that the evidence introduced at trial is insufficient to establish that the union's actions in processing Landry's grievances were "arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190, 87 S.Ct. at 916. We affirm the judgment NOV on this ground.

#### 1. The 1985 Rain Incident

We start with the 1985 rain incident, which, as Landry's third disciplinary citation, triggered the revocation of his "G" card. Landry contends that Local 854 breached its duty of fair representation in failing to investigate this grievance adequately. He also faults the union for refusing to resolve the dispute on the merits through arbitration.

In support of his claim, Landry notes that the evidence established that the union president, Tyrone Webster, declined to meet with Landry to discuss his grievance. Landry testified that Webster stated he was "too busy" for such a meeting. Landry also points to the fact that NOSSA officials testified that they agreed to return Landry's card primarily because union representatives lobbied them on "humani-

tarian grounds," stating that Landry had suffered enough and needed to return to work to support his family. In seeking the return of Landry's card, Local 854 officials did not focus on the merits of Landry's grievance.

Even when this evidence is considered in the light most favorable to Landry, however, it is not sufficient to support a conclusion that Local 854 breached its duty of fair representation. The failure of a union president to meet with a grievant does not provide sufficient evidence to establish that the union did not investigate a claim adequately. In fact, it is undisputed that union vice-president Ray Worthy was present on the docks at the time of the rain incident. Worthy was able to determine the prevailing weather conditions. He questioned the protesting workers and the Cooper/Smith supervisor. Worthy also discovered that 23 of the 25 workers on the crew went to work without protest; Landry was one of two workers who refused to work because of the rain.

Under these circumstances, Local 854 may well have concluded that a humanitarian appeal was more likely to succeed in regaining Landry's card than would an arbitration based on the merits of Landry's claim. The decision not to arbitrate the grievance on its merits was clearly within the union's discretion. *Vaca*, 386 U.S. at 191–95, 87 S.Ct. at 917–19.

The insufficiency of evidence to support Landry's contention that Local 854 breached its duty of fair representation becomes even more apparent when one examines the uncontradicted evidence regarding the actions the union did take to prosecute Landry's grievance. Ray Worthy immediately took up Landry's cause at a Step One negotiation, attempting to avert a disciplinary citation for the rain incident. When that approach proved unsuccessful, Local 854 supported Landry at a Step Two meeting before the Disputes Resolution Committee, with both union representatives on the Committee voting in Landry's favor. When Landry's registration card was nevertheless revoked under the "just cause" provision of the collective bargain-

ing agreement, the Union repeatedly requested that NOSSA officials return the card. Ultimately, a settlement was reached so that the revocation of Landry's card was reduced to a 72–day suspension, and he was allowed to return to work.

In short, the evidence conclusively established that Local 854 diligently pursued Landry's grievance, albeit not on the grounds or with the tactics Landry desired. *Cf. Hart v. Nat'l Homes Corp.*, 668 F.2d 791, 794 (5th Cir.1982). The union's duty of fair representation, however, was not "a ministerial one of satisfying each employee's demands at all costs." *Cox*, 607 F.2d at 142.

Landry's dispute with Local 854 over the rain incident is, at bottom, a disagreement over tactics and discretionary decisions. The evidence in support of Landry's claim does not indicate any arbitrary, discriminatory, or bad faith conduct by the union. Thus, the evidence is insufficient to establish that Local 854 breached its duty of fair representation in grieving Landry's disciplinary citation for refusing to work in the rain.

### 2. *The 1983 Poor Production Citations*

■ Landry also contends that Local 854 breached its duty of fair representation in failing to reschedule the arbitration over the poor production citations issued to 25 union members, including Landry, in 1983. In support of his claim, Landry notes that union officials did not respond to repeated requests by the members to take this matter to arbitration. Landry testified that when Tyrone Webster was running for union president in 1983, he promised the workers that he would restart the arbitration. Webster did not do so when elected. The testimony also indicated that union officials did not inform the members of the reasons for their decision to abandon the arbitration over the poor production citations. Finally, the evidence established that the collective bargaining agreement provided for hourly wages for freight handlers. Landry and other union members testified that they interpreted this provision as precluding production quotas set by the employer.

The union president, Tyrone Webster, conceded that he did not adequately explain to union members why the arbitration was not rescheduled. Webster testified, however, that Local 854 had decided that continued arbitration over the poor production issue would not be in the best interest of all of its members. At the time of this dispute, production in the Port of New Orleans was declining to the extent that New Orleans-based companies and workers were losing business to other, more productive, ports. Union officials decided that an arbitration over poor production would exacerbate this problem by bringing negative publicity to the port and the union. The union feared that the ultimate result of arbitration would be less work for its members.

The testimony of a NOSSA official, Win Niemand, confirmed that the New Orleans port had production problems which led to declining stevedoring business. Niemand testified that NOSSA discussed this problem with union officials, seeking their cooperation to increase production in order to avert a further loss of work. On the question of whether the attempt to introduce production quotas violated the collective bargaining agreement, Neimand stated that NOSSA took the firm position that the employers had the right to demand a certain level of production pursuant to the management rights clause of the Agreement.[6]

Under these circumstances, Local 854 was well within its discretionary right in deciding not to arbitrate the poor production citations. Courts have long recognized that a union must, at times, subordinate the interests of individual employees to the collective interest of all union members. *Vaca*, 386 U.S. at 182, 87 S.Ct. at 912; *Tedford v. Peabody Coal Co.*, 533 F.2d 952, 957 (5th Cir.1976). In addition, a union may act according to its own reasonable interpretation of the collective bargaining agreement. Local 854 could recognize an interpretation allowing the employer to set acceptable production quotas under the management rights clause. A union is not required to advocate a different interpretation preferred by some individual union members. *Bache*, 840 F.2d at 290.

The evidence offered by Landry does not refute that there was a production problem in the Port of New Orleans which adversely affected the stevedoring companies and the freight handlers. Instead, Landry contends that the fact that Tyrone Webster broke his promise to restart arbitration and did not explain to union members why the union had abandoned the poor production issue is sufficient to establish a breach of the duty of fair representation. This conduct by union officials may fall short of the best in contract administration, but the duty of fair representation does not reach all less than perfect behavior. *Connally*, 583 F.2d at 203. *See also Freeman v. O'Neal Steel, Inc.*, 609 F.2d 1123, 1126–27 (5th Cir.), *cert. denied*, 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980) (A union did not breach its duty of fair representation by informing an employee that his grievance had been rejected by an arbitrator, when in fact it had been withdrawn). Instead, the duty is breached only by conduct that is arbitrary, discriminatory, or in bad faith.

Under this standard, "a union may refuse to process a grievance or handle the grievance in a particular manner for a multitude of reasons," so long as a union acts in good faith and there is some nonarbitrary basis for its decision. *Griffin v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers*, 469 F.2d 181, 183 (4th Cir.1972). The overwhelming evidence established that Local 854 did not resume the arbitration over the poor production citations because it thought such a step would not enhance the greater good of all union members. This decision cannot be considered arbitrary, and there is no evidence that it was motivated by ill will toward Landry or discriminatory motives. The evidence is therefore insufficient to establish that the union breached its duty of fair representation in

---

**6.** Article XIV(a) of the Deep–Sea Agreement stated: "Except as specifically restricted by express language of this contract, management shall have the right to direct the performance of work."

refusing to arbitrate Landry's earlier poor production citations.

### V. Conclusion

The evidence conclusively establishes that Local 854 actively prosecuted Landry's grievance, with no indication of bias or unfairness, when NOSSA revoked Landry's registration card after his 1985 refusal to work in the rain. The overwhelming evidence also indicates that the union declined to reschedule the arbitration over Landry's 1983 poor production citations because it feared such an action would contribute to the declining business in the Port of New Orleans, and thus would not be in the best interest of all union members. Landry takes issue with certain tactics adopted by Local 854, including its failure to explain its decision to abandon the poor production arbitration to the union members. But there is no evidence of arbitrary, discriminatory, or bad faith conduct by the union in prosecuting any of Landry's grievances. The evidence is therefore not sufficient to establish that the union breached its duty of fair representation, which is the critical element of Landry's claim against the union and his employer. The judgment notwithstanding the verdict entered by the district court must be affirmed.

AFFIRMED.