Thomas LATIMER, et ux, Carol Latimer, Plaintiffs–Appellants,

v.

SMITHKLINE & FRENCH LABORATORIES, A DIVISION OF SMITHKLINE BECKMAN CORP., et al., Defendants–Appellees.

No. 90–1118.

United States Court of Appeals, Fifth Circuit.

Dec. 14, 1990.

**302**

Timothy M. Fults, Dallas, Tex., for plaintiffs-appellants.

James K. Peden, III, Sheree L. McCall, Strausburger & Price, Dallas, Tex., for SmithKline.

Steven R. McCown, Jennifer A. Youpa, Jenkens & Gilchrist, Dallas, Tex., for Chevron Chemical Co. and Ciba–Geigy Corp.

Before GOLDBERG, KING and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Thomas Latimer appeals a summary judgment in favor of defendants SmithKline & French Laboratories and Ortho Consumer Products.[1] Latimer alleges that a combination of his exposure to a pesticide manufactured by Ortho and his ingestion of a prescription drug made by SmithKline caused him to sustain damages. Finding that the facts in the record do not support Latimer's causal theory, the district court granted the defendants' motion for summary judgment. We agree that no genuine factual issue concerning causation is presented, and we therefore affirm.

I.

While working in his yard on July 20, 1985, Thomas Latimer developed a severe headache and began suffering from nausea and fatigue. Over the next several months, he continued to experience frequent headaches as well as slurred speech, unstable vision, and the inability to concentrate. After the symptoms began, Latimer was examined by Dr. Thomas Kurt, who offered an initial diagnosis based on the following erroneous assumption: that in late July, a couple of days before Latimer's symptoms appeared, a commercial lawn service had treated Latimer's lawn extensively with Diazinon, a pesticide manufactured by Ortho Consumer Products. Operating under this assumption, Dr. Kurt initially diagnosed Latimer's condition as "an acute and delayed neuropathy of a central nature related to [Latimer's] Diazanon [sic] exposure. He was probably made more susceptible to this by taking Cimetidine."

---

1. Ortho Consumer Products is a division of Chevron Chemical Company and CIBA–GEIGY Corporation. SmithKline & French Laborato-

ries is a division of SmithKline Beckman Corporation.

Cimetidine is the generic name for the prescription drug Tagamet, manufactured by SmithKline & French Laboratories. Latimer had been taking Tagamet since February of 1983. According to Dr. Kurt's original theory, the "acute and delayed neuropathy," also characterized as organophosphate poisoning, resulted from the combination of Latimer's limited exposure to Diazinon and his regular ingestion of Tagamet. Because organophosphate poisoning typically occurs in persons, such as professional lawn workers, who receive frequent and significant exposure to the chemical, Dr. Kurt sought to isolate other possible causal factors. He testified that Tagamet inhibits certain types of drugs (specifically, organophosphates, such as Diazinon, as well as carbamates) from passing through the liver, causing them to remain in the body longer than normal and thereby creating an artificially high exposure level.

Dr. Kurt later found out that Latimer's lawn had not received a commercial application of Diazinon since the fall of 1984 and that the most recent application of Diazinon to Latimer's lawn, which Latimer had done himself, occurred in *June* rather than in July of 1985. According to the testimony of an employee of the lawn service used regularly by Latimer, although the service had treated Latimer's lawn with some chemicals on July 22, 1985, those chemicals did not include Diazinon. Taking this new information into account, Dr. Kurt then revised his diagnosis to say that Latimer suffered from either organophosphate or carbamate poisoning, but Dr. Kurt refused to speculate as to which.

Latimer brought this action against SmithKline and against Ortho, alleging that he suffered neurological damage as a result of exposure to Tagamet and Diazinon. He asserts two claims against all defendants: negligence for failure to warn and violation of the Texas Deceptive Trade Practices and Consumer Protection Act, Tex.Bus. & Com.Code Ann. § 17.41, et seq. He alleges an additional claim against SmithKline: breach of express and implied warranties. Defendants moved for summary judgment urging a lack of causation.

## II.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The moving party need not produce evidence negating the existence of a material fact, but need only point out the absence of evidence supporting the nonmoving party's case. *Id.* 106 S.Ct. at 2554; *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1195 (5th Cir. 1986). If the moving party carries his initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of genuine issue of material fact. This showing requires more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) (citations omitted). This is both the district court's standard for ruling on a summary judgment and our standard for its review. *O'Neill v. Airline Pilots Ass'n Int'l,* 886 F.2d 1438, 1443 (5th Cir.1989) (citing *Bache v. American Telephone & Telegraph,* 840 F.2d 283, 287 (5th Cir.), *cert. denied,* 488 U.S. 888, 109 S.Ct. 219, 102 L.Ed.2d 210 (1988)).

## III.

■ Whether the claim against Ortho survives summary judgment depends on the lapse of time from the application of Diazinon to Latimer's lawn until his illness. Dr. Kurt based his original diagnosis on the belief that Latimer's yard had been commercially treated with Diazinon in July

of 1985 and that, two days later, Latimer and his wife worked in the yard extensively over a two-day period. It was during that time that Latimer's symptoms first appeared. The obvious implication of Dr. Kurt's remarks was that Latimer's *very recent* exposure to the July application of Diazinon, coupled with his taking Tagamet, was the cause of Latimer's condition. Indeed, in response to the question how long after Diazinon exposure one would expect to see symptoms, Dr. Kurt stated that it can occur immediately, if ingested directly, or "even up to a week in a kind of subtle exposure."[2] Thus the implication is that if more than a week or so elapsed between the last Diazinon treatment and the onset of Latimer's symptoms, there would be no causal link between Diazinon and Latimer's illness. And the Diazinon application that occurred closest to and before the onset of Latimer's symptoms occurred in June of 1985, nearly two months before the illness set in. Therefore, we agree there is no genuine factual issue as to the causal link between Diazinon and Latimer's illness and affirm the district court's judgment as to Ortho.

## IV.

The absence of a "timely" exposure to Diazinon led Dr. Kurt to a new theory. In his October 1989 deposition, Dr. Kurt offered a revised diagnosis of Latimer's condition, calling it "pesticide exposure" rather than "Diazinon exposure." His theory now is that Latimer's condition resulted from the combination of taking Tagamet and exposure to some "cholinesterase inhibiting pesticides, which could include carbamates or organophosphates." Although the record is unclear on this point, Dr. Kurt apparently now believes that, rather than

2. The following exchange also took place at the deposition of Dr. Kurt:
   Q. If Tom Latimer's testimony indicated he had taken Tagamet for a long period of time, at least maybe two years prior to when his problems developed, how do you explain if he was exposed to various organophosphates, that none of his problems developed for such a long period of time?
   A. I doubt if he had as extensive an exposure as he did during that August.

exposure to Diazinon, exposure to *Sevin* dust combined with Tagamet to cause Latimer's illness. In a February 20, 1989, letter to a colleague, Dr. Kurt wrote the following: "[After reviewing Latimer's files,] [m]uch to my surprise, I found that his original chemicals of exposure did not include organophosphates, but the carbamate, Sevin." Other than Dr. Kurt's statements, however, we find no evidence in the record indicating that Latimer was exposed to Sevin during the relevant time period. In fact, there is no evidence that Latimer has ever been exposed to Sevin. Both Mr. Latimer and Mrs. Latimer testified that Mr. Latimer never came into contact with Sevin.[3] Because, under Dr. Kurt's causal theory, recent exposure to either some organophosphate or some carbamate is necessary to link Tagamet to Latimer's illness, and because the evidence in the record does not establish the requisite exposure, we affirm the district court's summary judgment as to SmithKline as well.

AFFIRMED.

Q. So it would need to be some kind of extensive immediate exposure?
A. Not necessarily immediate, but cumulative over a period of days to weeks.

3. In an affidavit, Mrs. Latimer stated the following: "I was the one who used Sevin dust on the flowers and vegetables to control bugs. I never saw Tom have any contact with the Sevin dust."